UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| Dr. SHARON "CORY" HARMON, individually; | NO.: _____ |
| Plaintiff, | COMPLAINT FOR SEXUAL HARASSMENT and other CIVIL RIGHTS VIOLATIONS, ASSAULT, NEGLIGENT/INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS |
| v. | |
| GLENN T. IACOVETTA, individually and in a professional capacity; THE UNITED STATES OF AMERICA BY AND THROUGH JOHN M. MCHUGH, Secretary of the Army, | |
| | DEMAND FOR A JURY |
| Defendants. | |

## I. JURISDICTION AND VENUE

1.1     The Court has jurisdiction over the subject matter and parties to this action.

1.2     This action is brought pursuant to Title VII of the Civil Rights Act of 1964 as amended, for employment discrimination.   Jurisdiction is specifically conferred on this Court by 42 U.S.C. § 2000e-5 and against the parties under 42 U.S.C. § 2000(e)-16, 29 C.F.R. Subpart D § 1614.407.  Equitable and other relief are also sought under 42 U.S.C. §§2000e(5)(g) and 1985.  Jurisdiction is also based on 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 1981 et seq.

Complaint for Sexual Harassment and
Other Civil Rights Violations                    1

III BRANCHES LAW, PLLC
Joan K. Mell
1033 Regents Blvd. Ste. 101
Fircrest, WA 98466
joan@3brancheslaw.com
253-566-2510 ph
281-664-4643 fx

## II. PARTIES

### Plaintiff

2.1    Dr. Sharon "Cory" Harmon, Phd. is a clinical psychologist.    She works at Madigan Army Medical Center in the Department of Behavioral Health at Joint Base Lewis-McChord, WA.    She is a resident of Tacoma, Pierce County, Washington.    She is a licensed health professional in good standing.    Her employment classification is GS-018-14.

### Defendants

### (Glenn T. Iacovetta - Personally and Professionally)

2.2    Glenn T. Iacovetta is not a health care professional.    He is a retired military pilot who defendant Army hired to work as a Program Manager in the Automated Behavioral Health Clinic (ABHC) in the Program Management Office (PMO) a system within Madigan Health Care System at Madigan Army Medical Center (MEDCOM-MDAC).    His grade status is GS-13.    He retired from the US Army in March of 2008 at the rank of Lieutenant Colonel and has since been employed as a civilian employee at Joint Base Lewis McChord (JBLM).    He is believed to be a resident of Vancouver, WA.    He was Dr. Harmon's direct supervisor from the beginning of her employment in May 2009 to August 29th, 2010.    Defendant Army terminated him from his position, a decision he appealed, and defendant Army then returned him to Dr. Harmon's Area of Operations as of June 2011.

2.3    Defendant Iacovetta engaged in misconduct for individual benefit and gain and in the alternative Defendant Iacovetta engaged in misconduct using

III BRANCHES LAW, PLLC
Joan K. Mell
1033 Regents Blvd. Ste. 101
Fircrest, WA 98466
joan@3brancheslaw.com
253-566-2510 ph
281-664-4643 fx

his official position.   All of his acts and omissions were done individually and in the alternative within the course and scope of his employment for the defendant Army.

2.4     Defendant Iacovetta has been the subject of at least three separate investigations with adverse findings against him.

(United States of America- US Army)

2.5     The Defendant United States of America is the federal government entity that employed defendant Iacovetta.  The involved agency is the Department of the Army.  The head of the Department of the Army is John M. McHugh, Secretary of the Army.   The involved subdivision of the U.S. Army is the Army Medical Department, Western Regional Medical Command at Madigan Army Medical Center at Joint Base Lewis-McChord. (JBLM-MEDCOM MAMC).   This action also concerns the acts and omissions of Renay Wilson, Acting JBLM EEO officer and her staff Frankie Austin at the Department of the Army's Equal Employment Opportunity civilian office.  The acts of misconduct in this matter occurred primarily at JBLM, in Pierce County, WA.

III. NATURE OF THE CASE

3.1     Within the first month or two of Dr. Harmon's employment, defendant Iacovetta began grooming Dr. Harmon to be dependent upon him.  He put his arm around her, pulled her close to his side and said "You know Cory, you stick with me and I will take care of you."

3.2     Defendant Iacovetta explained that he valued employees who would "cover" for him like he "covered" his military buddy Johnny West who he let use his home to engage in extramarital affairs.

III BRANCHES LAW, PLLC
Joan K. Mell
1033 Regents Blvd. Ste. 101
Fircrest, WA 98466
joan@3brancheslaw.com
253-566-2510 ph
281-664-4643 fx

3.3     Apparently Mr. West held a position that funded Mr. Iacovetta's post-retirement position at Madigan.

3.4     After Mr. West visited Iacovetta's offices at Madigan in September of 2009, defendant Iacovetta told Dr. Harmon that Mr. West thought she was a "bitch."   He explained that West thought she was a "bitch" because West knew he "couldn't have his way with" Dr. Harmon, and in the military that type of woman was a "bitch."   Later in the summer of 2010, defendant Iacovetta told Dr. Harmon that West said, Dr. Harmon looked good but her butt and breasts were too small.

3.5     Throughout 2009, defendant Iacovetta looked Dr. Harmon up and down, remarking that he wanted to take her clothing shopping so she would dress differently.   She dressed conservatively.   Defendant Iacovetta commented on other women, making statements such as "Is she hot?" and "Will she wear short skirts?"   Dr. Harmon understood defendant Iacovetta wanted her to wear more provocative and revealing clothing.

3.6     In approximately July of 2009, defendant Iacovetta looked Dr. Harmon up and down with a smile on his face.   He put his hands straight out in front of himself reaching forward towards Dr. Harmon's breasts, then he squeezed his hands together making pinching motions and commented "I feel frisky."

3.7     In approximately May of 2010, defendant Iacovetta commented to Dr. Harmon when she recommended a colleague for an open position "He's not Mormon, is he?   We have enough Mormons around here."

3.8     Repeatedly throughout his supervision, defendant Iacovetta would approach Dr. Harmon from behind.   He would tickle her along her sides and

III BRANCHES LAW, PLLC
Joan K. Mell
1033 Regents Blvd. Ste. 101
Fircrest, WA 98466
joan@3brancheslaw.com
253-566-2510 ph
281-664-4643 fx

about her neck and shoulders.

3.9     Dr. Harmon found this contact offensive and she told him to stop.

3.10    Dr. Harmon said "No tickling" and would try to move out of his reach.   He continued to assault her.

3.11    In August of 2010, defendant Iacovetta made rude comments about another female employees "tits."

3.12    In August of 2010, defendant Iacovetta inquired about a new hire stating "Is she Mormon? Is she hot? Will she wear short skirts?"

3.13    In 2010, Dr. Harmon overheard defendant Iacovetta masturbating and/or having phone sex in his office during office hours.  She heard him panting for about one minute and then leave to go to the restroom.  She later learned that defendant Iacovetta affirmed to another doctor that he was indeed having phone sex, but claimed it was before duty hours.

3.14    In approximately September of 2010, when defendant Iacovetta learned that Dr. Harmon and her fellow colleagues were reporting his misconduct and did not want to work with him, he began to disparage them.   He made false allegations claiming Dr. Harmon was creating a hostile work environment for him and that the staff were being snide.   He claimed Dr. Harmon had "gone to the dark side."   He began to ignore Dr. Harmon and would not acknowledge her presence or positive work performance.

3.15    In addition to the incidents specifically described above, defendant Iacovetta engaged in a pattern of abusive and offensive behavior directed towards Dr. Harmon and other women in the office.   He made inappropriate sexual comments and anti-mormon statements in addition to the specific comments set forth previously.

III BRANCHES LAW, PLLC
Joan K. Mell
1033 Regents Blvd. Ste. 101
Fircrest, WA 98466
joan@3brancheslaw.com
253-566-2510 ph
281-664-4643 fx

3.16    Dr. Harmon found his comments and behaviors harassing and intimidating.   She found his comments to others about her belittling and denigrating.   Defendant Iacovetta undermined her professional reputation and competence.

3.17    Dr. Harmon found it difficult to work productively and attentively while fearing his abuses.   She heard about his threats and that he had high level military contacts who would protect him.   She feared for her safety and security.   He was rumored to have a gun related to past misconduct.

3.18    She suffered emotionally and physically from his insults and harassment.

3.19    On or about September 21st, 2010, Dr. Harmon discussed defendant Iacovetta's improprieties with Gary Southwell.   He suggested she call the EEO office to complain.   Dr. Harmon called the EEO office and reported her concerns to Frankie Austin.

3.20    Ms. Austin asked her to prepared a list of incidents, which she prepared and provided to the EEO on or about September 23rd, 2010.   She inquired whether she needed to take any further action.

3.21    LTC Southwell advised her that the matter was to be handled at the lowest level possible and he arranged to have defendant Iacovetta relocated.

3.22    Defendant Iacovetta did not relocate promptly.   He continue to make his presence known in his office and around the building.   Defendants did not provide a safe work environment for Dr. Harmon.   It took at least a month for defendants to relocate him.

3.23    Defendant Army initiated a 15-6 investigation in response to Dr. Harmon's EEO complaint on or about October 12, 2010, which was conducted by LTC Spencer Dickens, at the direction of Col. Jerome Penner.

III BRANCHES LAW, PLLC
Joan K. Mell
1033 Regents Blvd. Ste. 101
Fircrest, WA 98466
joan@3brancheslaw.com
253-566-2510 ph
281-664-4643 fx

3.34    Frankie Austin encouraged Dr. Harmon to wait for the investigation results as the investigation was the proper means for handling the matter at the lowest level possible consistent with EEO policy.  Ms. Austin further assured Dr. Harmon that she could file a formal complaint with the EEO after the 15-6 investigation if the investigation did not stop the misconduct.

3.35    Throughout the course of the 15-6 investigation, defendant Iacovetta continued to disparage Dr. Harmon in retaliation for her reporting her complaints.  He encouraged his friend Johnny West to do the same.  Dr. Harmon reported this retaliation to Frankie Austin at the EEO office.  Frankie Austin encouraged Dr. Harmon to let the investigators do their jobs and that it would be ok.

3.36    Defendant Army completed the 15-6 investigation on or about January 4th, 2011. The investigation and its findings are incorporated herein by reference at Appendix A. LTC Dickens found defendant Iacovetta engaged in inappropriate touching of several female employees and that he made negative comments about hiring Mormons. Defendant Iacovetta was found to be not credible.   The investigator concluded defendant Iacovetta engaged in sexual harassment and religious discrimination and that he created a hostile work environment.  He explained that the conduct was "egregious and substantiated by overwhelming evidence."   He found defendant Iacovetta's actions to be "a complete failure as a supervisor."   The investigator recommended defendant Army suspend him immediately and process him for termination.  Col. Jerome Penner approved the finding and recommendations in the Spring of 2011.

3.37    Defendant  Iacovetta  appealed  his  termination,  and

III BRANCHES LAW, PLLC
Joan K. Mell
1033 Regents Blvd. Ste. 101
Fircrest, WA 98466
joan@3brancheslaw.com
253-566-2510 ph
281-664-4643 fx

ultimately was reinstated.  Reportedly, defendant Army thought it cheaper to reinstate him than to continue to process his termination.   Other reports indicate defendant Army downgraded the termination to two weeks paid suspension due to procedural errors and delay.  The official, Col. Yost, who downgraded the penalty did not actually read the report or statements, he merely relied upon a summary that did not detail the pertinent facts.

3.38    During this lengthy investigation and review process, Dr. Harmon remained in contact with the EEO office reporting her complaints that defendant Iacovetta appeared to be getting away with his misconduct and violating her rights.  She felt the defendant Army went out of its way to marginalize the offensive nature of defendant Iacovetta's comments and gestures.

3.39    Additional  allegations  of  sexual  misconduct  surfaced  regarding defendant Iacovetta as well as allegations of misconduct involving Mr. West.  This led to an informal investigation and finally another AR 15-6 investigation, the findings of which are also incorporated herein by reference. Appendix B.  This investigation was initiated in September of 2011 and ended on or about November 9th, 2011.

3.40    The  third  investigation  resulted  in  additional  findings  of  misconduct  by defendant Iacovetta.  He was found to have created a hostile work environment by asking about a doctor's bra size, and bragging about his sexual history, to include having sex in his office.

3.41    The  third  investigation  also  found  that  defendant  Iacovetta  made  frequent disparaging remarks about Dr. Harmon and that his "unremitting critique" likely had an effect on her colleagues.  This includes intimidating Dr. Slade to

III BRANCHES LAW, PLLC
Joan K. Mell
1033 Regents Blvd. Ste. 101
Fircrest, WA 98466
joan@3brancheslaw.com
253-566-2510 ph
281-664-4643 fx

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32

make a false report to negatively influence the initial investigation.

3.42    Defendant Iacovetta engaged in threatening conduct to include statements such as he hoped he didn't run into Dr. Harmon because he was not sure what he would do to her and that Dr. Harmon would regret filing a statement against him.

3.43    Dr. Harmon asked repeatedly to file a formal complaint with the EEO without response from the office. The EEO deferred to the internal investigation process.

3.44    As of June 28th, 2011, Dr. Harmon reported her concerns for her safety with defendant Iacovetta returning to work in her area.   She reported her complaints to Frankie Austin and stressed her interest in formal complaint.

3.45    Frankie Austin later extended the timelines due to contacts she was required to make thus precluding Dr. Harmon from filing a formal complaint.

3.46    On or about August 17th, 2011, Dr. Harmon contacted Frankie Austin again reminding her that she wanted to file a formal complaint to include all of the past misconduct as she had been promised she could do while she was told to wait for the results of the AR 15-6 investigation.

3.47    On or about September 9th, Frankie Austin provided Dr. Harmon the formal complaint form.

3.48    During this time, defendant Iacovetta continued to be present in the workplace. Dr. Harmon was promised that she would be advised when he was coming in to her building, but she was not consistently provided advance notice of his presence. Given his threats, she feared coming into contact with him. Defendants failed to provide her a safe work environment free from retaliation.

III BRANCHES LAW, PLLC
Joan K. Mell
1033 Regents Blvd. Ste. 101
Fircrest, WA 98466
joan@3brancheslaw.com
253-566-2510 ph
281-664-4643 fx

3.49    On or about September 21st, 2011, Dr. Harmon filed her formal complaint.   Her compliant described the sexual harassment and retaliation to include the denigrating comments and threats.

3.50    On or about September 22nd, 2011, Frankie Austin confirmed receipt of Dr. Harmon's formal complaint and she assured Dr. Harmon that she had met the deadline for filing.

3.51.   On or about March 7th, 2012, Renay Wilson, Acting JBLM EEO Officer dismissed her complaint as untimely and notified Dr. Harmon of her right to sue. Dr. Harmon has filed her complaint within thirty days of having received her right to sue letter, which is attached as Appendix C.

3.52    Defendant Army failed to acknowledge the hostile work environment that Dr. Harmon worked in when it returned defendant Iacovetta to her area of operation and when it allowed him to come into contact with her unannounced.

3.53    Defendant Army failed to acknowledge the scope of her EEO complaint by omitting key facts and allegations of her complaint.

3.54    Defendant Army failed to acknowledge that it counseled Dr. Harmon to rely upon and wait for the outcome of the AR 15-6 investigation.  Defendant Army relied upon the investigation to avoid undertaking its own investigation and it discouraged Dr. Harmon from processing a formal EEO complaint.  The EEO office assured her that the forty-five day filing requirement would be tolled during the investigation and subsequent outcome.

3.55    Defendant Army erroneously dismissed her formal EEO complaint citing the 45 day rule that it had told her did not preclude her from filing a

III BRANCHES LAW, PLLC
Joan K. Mell
1033 Regents Blvd. Ste. 101
Fircrest, WA 98466
joan@3brancheslaw.com
253-566-2510 ph
281-664-4643 fx

formal complaint after the internal investigation was completed and finalized.

3.56     Dr. Harmon filed a formal complaint within forty-five days of learning the outcome of the investigation was that defendant Iacovetta was returning to work where he would be in contact with her, and that he continued to disparage her.

3.57     Defendants' third investigation further supports the threat defendant Iacovetta is to Dr. Harmon and defendants have failed to take action to protect her.

3.58     Defendant Iacovetta continues to be employed by defendant Army.

3.59     Dr. Harmon has suffered and continues to suffer working in a hostile work environment.    She has been threatened and retaliated against.    She continues to be vulnerable to the disparagement of defendant Iacovetta.   She has been defamed by untrue statements to include a false allegation by Dr. Slade that she used a racist comment which was prompted by defendant Iacovetta.

3.60     Defendant Army has failed to take action on the retaliation and has failed to provide Dr. Harmon a safe work environment free from unlawful discrimination.

3.61     Dr. Harmon has incurred economic and non-economic losses.

3.62     Dr. Harmon has suffered emotionally and physically, incurring general pain and suffering.

## IV. CAUSES OF ACTION

### Discrimination

4.1     Defendants engaged in unlawful discrimination and retaliation based upon sex and religion.   Dr. Harmon has been forced to work in a hostile work environment.   She attempted to resolve these matters at the lowest level possible and

III BRANCHES LAW, PLLC
Joan K. Mell
1033 Regents Blvd. Ste. 101
Fircrest, WA 98466
joan@3brancheslaw.com
253-566-2510 ph
281-664-4643 fx

did indeed exhaust the administrative remedies available to her.

4.2     Defendants discriminatory acts have created a hostile work environment where sexual and religious harassment are tolerated.    Defendant Army has permitted defendant Iacovetta to threaten and intimidate Dr. Harmon and disparage her in retaliation for her reports of his misconduct.  Defendant Army continues to allow defendant Iacovetta to work in close proximity to Dr. Harmon and the other women he offended without protection from his abuse or threats.

4.3     Defendants' misconduct is ongoing, and Dr. Harmon continues to report to work in a hostile environment where she fears retaliation and where her reputation has been compromised.

4.4.    Defendant Iacovetta's comments and behavior as described above were offensive and continued despite Dr. Harmon asking him to stop.

4.5     Defendant Army failed to conduct an immediate and prompt investigation. Defendant Army relied upon an internal investigatory process and had Dr. Harmon rely upon an internal investigative process that did not promptly and timely address her right to be free of sexual and religious harassment in the workplace.   Further, defendant Army failed to properly process and respond to her complaints.   Defendant Army erroneously dismissed her EEO complaint when the misconduct was ongoing and because it did not consider the scope of her complaint in its analysis.

4.6     As a direct and proximate result of defendants' misconduct, Dr. Harmon has been harmed all in an amount to be proven at the time of trial.

III BRANCHES LAW, PLLC
Joan K. Mell
1033 Regents Blvd. Ste. 101
Fircrest, WA 98466
joan@3brancheslaw.com
253-566-2510 ph
281-664-4643 fx

### Violation of Civil Rights

### (42 U.S.C. § 1985)

4.7     Defendant Iacovetta is named in an individual and professional capacity in this matter.

4.8     Defendant Iacovetta conspired with his colleague and military buddy Johnny West to violate the rights of Dr. Harmon through the use of sexual innuendo and harassing comments.  They discussed her as if she were an object whom they could violate sexually. They shared comments about sleeping with her and whether they could have their way with her.  She was vulnerable to the abuse of her superior.

4.9     Once she reported the religious and sexual harassment, the two worked together to disparage her by calling her names and influencing witness testimony. Defendant Iacovetta conspired with Mr. West to ensure he continued his employment despite the adverse findings against him regarding sexual harassment.  Defendant Iacovetta sought out the support of his friend to disparage Dr. Harmon and in fact did disparage Dr. Harmon. This includes suggesting he was wrongfully accused as reflected in Mr. West's e-mail to command: "Do not let Glenn Iacovetta get railroaded."

4.10    Dr. Harmon has a protected life, liberty, and property interest in her professional reputation and good will as a credentialed health care provider and her position at Madigan.

4.11    She exercised her constitutionally protected right to report defendant Iacovetta's offensive behaviors to the EEO office and as a witness in the internal investigation process. She also asked that she not have to work around him and further

III BRANCHES LAW, PLLC
Joan K. Mell
1033 Regents Blvd. Ste. 101
Fircrest, WA 98466
joan@3brancheslaw.com
253-566-2510 ph
281-664-4643 fx

requested advance notice of his presence in her building.

4.12    Defendant Iacovetta chose to work in an area where he could continue to intimidate and harass Dr. Harmon.

4.13    Defendant Iacovetta violated Dr. Harmon's free speech rights and her right to seek redress.  Defendant Iacovetta, Johnny West, and defendant Army, interfered with violated her due process rights by interfering with the AR- 15-6 investigation and ultimate outcome.

4.14    As a direct and proximate result of defendant Iacovetta's misconduct, Dr. Harmon has been harmed all in an amount to be proven at the time of trial.

(Bivens)

4.15    Defendant Iacovetta is a federal official who for personal benefit and gain uses his official position to violate the rights of women such as Dr. Harmon.  He has exhibited deliberate indifference to the rights of Dr. Harmon.

4.16    Defendant Iacovetta has acted under color of federal law to violate the rights of Dr. Harmon.

4.17    Specifically, he has violated her right to a workplace free from sexual harassment and intimidation and religious discrimination and bias.  He has violated her due process rights by interfering with the investigation and ultimate outcome by disparaging her and deliberately and intentionally remaining in her workplace in a title and position where he can continue to intimidate and harass her.  He has violated her rights to free speech, specifically her right to report his misconduct to the EEO and to act as a witness in the AR 15-6 investigations.

4.18    As a direct and proximate result of defendant Iacovetta's

III BRANCHES LAW, PLLC
Joan K. Mell
1033 Regents Blvd. Ste. 101
Fircrest, WA 98466
joan@3brancheslaw.com
253-566-2510 ph
281-664-4643 fx

misconduct, Dr. Harmon has been harmed all in an amount to be proven at the time of trial.

Assault

4.19    During the course of Dr. Harmon's employment, Defendant Iacovetta deliberately and intentionally touched Dr. Harmon in an offensive manner.

4.20    Defendant Iacovetta repeatedly tickled Dr. Harmon up and down her sides and about her neck and shoulders, he put his arm around her and made offensive gestures towards her as though he intended to fondle her breasts.

4.21    Defendant's misconduct began in 2009 and continued into September of 2010.

4.22    Dr. Harmon told defendant to stop and he refused.

4.23    Defendant Iacovetta violated her person, dignity, and privacy.

4.24    As a direct and proximate result of defendant Iacovetta's misconduct, Dr. Harmon has been harmed all in an amount to be proven at the time of trial.

Negligent/intentional Infliction of Emotional Distress

4.25    Defendant Iacovetta intentionally and or negligently engaged in harassment and sexually inappropriate touching and comments for purposes of harming Dr. Harmon.

4.26    Defendant Iacovetta has a duty to keep his hands to himself, and to refrain from sexual harassment and intimidation.  He has a duty to meet the ethical and moral standards of an officer and or leader in the military.  He has a duty to respect the individuals who he works with and supervises.

4.27    Defendant Iacovetta's conduct was so offensive as to be intolerable to civilized society and his actions and behaviors violate all bounds of common decency.

4.28    As a direct and proximate result of defendant Iacovetta's

III BRANCHES LAW, PLLC
Joan K. Mell
1033 Regents Blvd. Ste. 101
Fircrest, WA 98466
joan@3brancheslaw.com
253-566-2510 ph
281-664-4643 fx

misconduct, Dr. Harmon has been harmed, all in an amount to be proven at the time of trial.

## V. PRAYER FOR RELIEF

Dr. Harmon requests the following relief:

5.1 Injunctive and declaratory relief;

5.2 An award of all economic and non-economic damages caused by defendants;

5.3 An award of all general and special damages caused by defendants, to include general pain and suffering and emotional harm;

5.4 An award of pre-judgment and post-judgment interest at twelve percent on any award;

5.5 An award of penalties and interest, 42 U.S.C. § 1985;

5.6 An award of attorney's fees and costs, 42. U.S.C. § 1988;

5.7 A trial by jury of any factual issues; and

5.8 Any further and other relief as the court may determine is just and equitable.

Dated this _____ day of April, 2012.

III BRANCHES LAW, PLLC

_____
Joan K. Mell, WSBA #21319
Attorney for Dr. Harmon

Complaint for Sexual Harassment and
Other Civil Rights Violations                    16

III BRANCHES LAW, PLLC
Joan K. Mell
1033 Regents Blvd. Ste. 101
Fircrest, WA 98466
joan@3brancheslaw.com
253-566-2510 ph
281-664-4643 fx

## VERIFICATION

STATE OF WASHINGTON        )
                           )  ss.
County of Pierce           )

I, Sharon "Cory" Harmon, have read the above complaint and know the contents of the same to be true and correct.

_____
Sharon "Cory" Harmon

COMPLAINT FOR SEXUAL HARASSMENT AND OTHER CIVIL RIGHTS
VIOLATIONS - 17

III BRANCHES LAW, PLLC
Joan K. Mell
1033 Regents Blvd. Ste. 101
Fircrest, WA 98466
joan@3brancheslaw.com
253-566-2510 ph
281-664-4643 fx

# Appendix A

**REPORT OF PROCEEDINGS BY INVESTIGATING OFFICER/BOARD OF OFFICERS**
For use of this form, see AR 15-6; the proponent agency is OTJAG.

Page 2

*IF MORE SPACE IS REQUIRED IN FILLING OUT ANY PORTION OF THIS FORM, ATTACH ADDITIONAL SHEETS*

**SECTION I - APPOINTMENT**

Appointed by **JEROME PENNER, COL, USA, Commanding**

*(Appointing authority)*

on ___6 OCT 2010___   (Attach Inclosure 1: Letter of appointment or summary of oral appointment data.) (See para 3-15, AR 15-6.)
*(Date)*

**SECTION II - SESSIONS**

The   (Investigation) (Board)   commenced at   **MADIGAN HEALTH CARE SYSTEM**   at   ___12 OCT 2010___
*(Place)* *(Time)*

on ___1445___   (If a formal board met for more than one session, check here ☐. Indicate in an Inclosure the time each session began and
ended, the place, persons present and absent, and explanation of absence, if any.) The following persons   (members, respondents, counsel)   were
present . (After each name, indicate capacity, e.g., President, Recorder, Member, Legal Advisor.)

The following persons   (members, respondents, counsel)   were absent: (Include brief explanation of each absence.) (See paras 5-3 and 5-8a, AR 15-6.)

The   (Investigating officer) (Board)   finished gathering/hearing evidence at   ___0730___   on   ___08 DEC 2010___
*(Time)* *(Date)*

and completed findings and recommendations at   ___1330___   on   ___04 JAN 2011___
*(Time)* *(Date)*

**SECTION III - CHECKLIST FOR PROCEEDINGS**

| A. COMPLETE IN ALL CASES | YES | NO | NA |
|---|:---:|:---:|:---:|
| Inclosures  (para 3-18, AR 15-6) | | | |
| Are the following inclosed and numbered consecutively with Roman numerals:  (Attached in order listed) | | | |
| a. The letter of appointment or a summary of oral appointment data? | ☒ | ☐ | ☐ |
| b. Copy of notice to respondent, if any (See item 9, below) | ☐ | ☐ | ☒ |
| c. Other correspondence with respondent or counsel, if any? | ☐ | ☐ | ☒ |
| d. All other written communications to or from the appointing authority? | ☒ | ☐ | ☐ |
| e. Privacy Act Statements/Certificate, if statement provided orally? | ☒ | ☐ | ☐ |
| f. Explanation by the investigating officer or board of any unusual delays, difficulties, irregularities, or other problems encountered  (e.g., absence of material witnesses)? | ☐ | ☐ | ☒ |
| g. Information as to sessions of a formal board not included on page 1 of this report? | ☐ | ☐ | ☒ |
| h. Any other significant papers (other than evidence)  relating to administrative aspects of the investigation or board? | ☐ | ☐ | ☒ |

FOOTNOTES:   If explain in negative answers on an attached sheet.
☒ Use of the NA column constitutes a positive representation that the circumstances described in the question did not occur in this investigation
or board.

DA FORM 1574, MAR 1983       EDITION OF NOV 77 IS OBSOLETE.       Page 1 of 4 pages       APD PE v1.00

| | | YES | NO | N/A |
|---|---|---|---|---|
| 2 | Exhibits *(para 3-16, AR 15-6)* | | | |
| | a. Are all items offered *(whether or not received)* or considered as evidence individually numbered or lettered as exhibits and attached to this report? | ☒ | ☐ | ☐ |
| | b. Is an index of all exhibits offered to or considered by investigating officer or board attached before the first exhibit? | ☒ | ☐ | ☐ |
| | c. Has the testimony/statement of each witness been recorded verbatim or been reduced to written form and attached as an exhibit? | ☒ | ☐ | ☐ |
| | d. Are copies, descriptions, or depictions *(if substituted for real or documentary evidence)* properly authenticated and is the location of the original evidence indicated? | ☐ | ☐ | ☐ |
| | e. Are descriptions or diagrams included of locations visited by the investigating officer or board *(para 3-6b, AR 15-6)?* | ☐ | ☐ | ☐ |
| | f. Is each written stipulation attached as an exhibit and is each oral stipulation either reduced to writing and made an exhibit or recorded in a verbatim record? | ☒ | ☐ | ☐ |
| | g. If official notice of any matter was taken over the objection of a respondent or counsel, is a statement of the matter of which official notice was taken attached as an exhibit. *(para 3-16d, AR 15-6)?* | ☐ | ☐ | ☒ |
| 3 | Was a quorum present when the board voted on findings and recommendations *(paras 4-1 and 5-3b, AR 15-6)?* | ☐ | ☐ | ☒ |
| **B. COMPLETE ONLY FOR FORMAL BOARD PROCEEDINGS** *(Chapter 5, AR 15-6)* | | | | |
| 4 | At the initial session, did the recorder read, or determine that all participants had read, the letter of appointment *(para 5-3b, AR 15-6)?* | ☐ | ☐ | ☐ |
| 5 | Was a quorum present at every session of the board *(para 5-3b, AR 15-6)?* | ☐ | ☐ | ☐ |
| 6 | Was each absence of any member properly excused *(para 5-3a, AR 15-6)?* | ☐ | ☐ | ☒ |
| 7 | Were members, witnesses, reporter, and interpreter sworn, if required *(para 3-1, AR 15-6)?* | ☐ | ☐ | ☒ |
| 8 | If any members who voted on findings or recommendations were not present when the board received some evidence, does the inclosure describe how they familiarized themselves with that evidence *(para 5-3d, AR 15-6)?* | ☐ | ☐ | ☐ |
| **C. COMPLETE ONLY IF RESPONDENT WAS DESIGNATED** *(Section II, Chapter 5, AR 15-6)* | | | | |
| 9 | Notice to respondents *(para 5-5, AR 15-6):* | | | |
| | a. Is the method and date of delivery to the respondent indicated on each letter of notification? | | | |
| | b. Was the date of delivery at least five working days prior to the first session of the board? | | | |
| | c. Does each letter of notification indicate — | | | |
| | (1) the date, hour, and place of the first session of the board concerning that respondent? | | | |
| | (2) the matter to be investigated, including specific allegations against the respondent, if any? | | | |
| | (3) the respondent's rights with regard to counsel? | | | |
| | (4) the name and address of each witness expected to be called by the recorder? | | | |
| | (5) the respondent's rights to be present, present evidence, and call witnesses? | | | |
| | d. Was the respondent provided a copy of all unclassified documents in the case file? | | | |
| | e. If there were relevant classified materials, were the respondent and his counsel given access and an opportunity to examine them? | | | ☒ |
| 10 | If any respondent was designated after the proceedings began *(or otherwise was absent during part of the proceedings):* | | | |
| | a. Was he properly notified *(para 5-5, AR 15-6)?* | | | ☒ |
| | b. Was record of proceedings and evidence received in his absence made available for examination by him and his counsel *(para 5-5, AR 15-6)?* | | | ☒ |
| 11 | Counsel *(para 5-6, AR 15-6):* | | | |
| | a. Was each respondent represented by counsel? | | | ☒ |
| | Name and business address of counsel: | | | |
| | *(If counsel is a lawyer, check here ☐)* | | | |
| | b. Was respondent's counsel present at all open sessions of the board relating to that respondent? | | | ☒ |
| | c. If military counsel was requested but not made available, is a copy *(or, if oral, a summary)* of the request and the action taken on it included in the report *(para 5-6b, AR 15-6)?* | ☐ | ☐ | ☒ |
| 12 | If the respondent challenged the legal advisor or any voting member for lack of impartiality *(para 5-7, AR 15-6):* | | | |
| | a. Was the challenge properly denied and by the appropriate officer? | | | ☒ |
| | b. Did each member successfully challenged cease to participate in the proceedings? | | | ☒ |
| 13 | Was the respondent given an opportunity to *(para 5-8a, AR 15-6):* | | | |
| | a. Be present with his counsel at all open sessions of the board which deal with any matter which concerns that respondent? | | | |
| | b. Examine and object to the introduction of real and documentary evidence, including written statements? | | | ☒ |
| | c. Object to the testimony of witnesses and cross-examine witnesses other than his own? | | | ☒ |
| | d. Call witnesses and otherwise introduce evidence? | | | |
| | e. Testify as a witness? | | | |
| | f. Make or have his counsel make a final statement or argument *(para 5-8, AR 15-6)?* | | | |
| 14 | If requested, did the recorder assist the respondent in obtaining evidence in possession of the Government and in arranging for the presence of witnesses *(para 5-8b, AR 15-6)?* | ☐ | ☐ | ☒ |
| 15 | Are all of the respondent's requests and objections which were denied indicated in the report of proceedings or is an inclosure or exhibit to it *(para 5-11, AR 15-6)?* | ☐ | ☐ | ☒ |

FOOTNOTES: 1/ Explain all negative answers on an attached sheet.
2/ Use of the N/A column constitutes a positive representation that the circumstances described in the question did not occur in this investigation or board.

**5.   ...ION VI - AUTHENTICATION**   (para 3-17, AR 15-6)

THIS REPORT OF PROCEEDINGS IS COMPLETE AND ACCURATE. (If any voting member or the recorder fails to sign here or in Section VII below, indicate the reason in the space where his signature should appear.)

_____
(Recorder)

_____
LTC SPENCER D. DICKENS JR.
(Investigating Officer) (President)

_____
(Member)

_____
(Member)

_____
(Member)

_____
(Member)

**SECTION VII - MINORITY REPORT**   (para 3-13, AR 15-6)

To the extent indicated in Inclosure _____ , the undersigned do(es) not concur in the findings and recommendations of the board. (In the inclosure, identify by number each finding and/or recommendation in which the dissenting member(s) do(es) not concur. State the reasons for disagreement. Additional/substitute findings and/or recommendations may be included in the inclosure.)

_____
(Member)

_____
(Member)

**SECTION VIII - ACTION BY APPOINTING AUTHORITY**   (para 2-3, AR 15-6)

The findings and recommendations of the (investigating officer) (board) are (approved) (disapproved) (approved with following exceptions/ substitutions). (If the appointing authority returns the proceedings to the investigating officer or board for further proceedings or corrective action, attach that correspondence (or a summary, if one) as a numbered inclosure.)

Reviewing the entire 15-6 investigation and recommendations by the Investigating Officer, I conclude that Mr. Glenn Iacovetta is responsible for Equal Opportunity infractions that constitute both sexual harassment and religious discrimination. His activities specifically created a hostile work environment for females in the clinic. Despite all the issues involved with the split of ABHC into Madigan Healthcare System and the Western Regional Medical Command, it is clear that infractions that involved Mr. Iacovetta were egregious and substantiated by overwhelming evidence. In his own statement, he supported the claim of touching a female subordinate and to "jokingly" denigrating a religious faith known to be prevalent in the office. A former Lieutenant Colonel of 23 years and supervisor should have had all appropriate training so I find that there is no mitigation for his actions. These actions cannot be tolerated under any circumstances. I can only conclude that this is a pattern of misbehavior that has gone unchecked for years but it has no place within the Madigan Healthcare System. An effective supervisor would have been able to lead his team toward compromise in an emotionally charged workplace rather than contribute to its further degradation. I find Mr. Iacovetta's actions to be a complete failure as a supervisor. Mr. Iacovetta will be suspended from his position effective immediately until processed for termination, in accordance with proper procedures of the Civilian Personnel System.

JEROME PENNER III
COL, MS
Commanding

CONTINUATION SHEET: DA FORM 1574, SECTION IV (FINDINGS)

1. Mr. Glenn T. Iacovetta made sexually inappropriate comments to Dr. Cory Harmon and other Automated Behavioral Health Clinic (ABHC) employees that made them feel uncomfortable and threatened in the work environment.

a. Mr. Iacovetta made inappropriate personal comments about the clothing and appearance of Dr. Harmon and other female employees. (*See* Exhibits A and B.) In at least one instance, Mr. Iacovetta's remarks were overtly sexual and intensely offensive to the person to whom they were directed. (*See* Exhibit A.) Dr. Harmon states that Mr. Iacovetta commented on a shirt Dr. Harmon was wearing, telling her that it accentuated her body shape nicely. (*See id.*) She reports that, later in the day Mr. Iacovetta made squeezing motions with his hands toward her breasts and remarked, "I feel frisky." (*See id.*) This so upset Dr. Harmon that she later threw away the shirt. (*See id.*)

b. Mr. Iacovetta related to Dr. Harmon sexually charged comments, which he attributed to (b)(6) that Dr. Harmon found offensive. (*See* Exhibits A and B.) Specifically, Mr. Iacovetta told Dr. Harmon that (b)(6) had said that she had a good figure, but that her breasts and butt were too small; and, on another occasion, that (b)(6) thought that Dr. Harmon was "a bitch" because (b)(6) knew that "he could not have his way with [her]." (Exhibit A. *See also* Exhibit B (confirming the "bitch" reference).) Dr. Harmon reports that Mr. Iacovetta amplified on the latter remark by observing to her that, "in the military, women who won't sleep with people who want to sleep with them are considered to be bitches." (*See id.*) Dr. Harmon also states that Mr. Iacovetta alleged that (b)(6) had encouraged him to enter a relationship with Dr. Harmon because Mr. Iacovetta was not doing well in his relations with his current girlfriend. (*See id.*) Dr. Harmon reports that these comments made her feel "very embarrassed, disgusted, and angry." (*See id.*)

c. Mr. Iacovetta told Dr. Harmon and Dr. Karstin L. Slade stories whose sexual content made Dr. Harmon and Dr. Slade uncomfortable. (*See* Exhibits A and F (statement 2).) Dr. Harmon relates that Mr. Iacovetta told her about numerous affairs to which he had been party while on active duty, including one in which he had covered for himself by telling convincing lies to the husband of his current lover. (*See* Exhibit A.) Dr. Slade states that Mr. Iacovetta recounted "several uncomfortable stories of his time on active duty, in which he and his comrades would engage in inappropriate (and illegal in the US) sexual activities overseas." (*See* Exhibit F (statement 2).) She adds that his lack of remorse or embarrassment as he told these stories added to her discomfort in listening to them. (*See id.*)

d. Mr. Iacovetta made several personal comments to Dr. Slade that she found uncomfortably suggestive. (*See* Exhibit F (statement 2).) These included the observations that, if she were not "that kind"—*i.e.*, a lesbian—she would be "just his type," and that Mr. Iacovetta's brother, who

---

[(b)(6)                                                                                          ] is a friend of Mr. Iacovetta, who served with (b)(6)        when both were Army officers on active duty. (*See, e.g.,* Exhibits A and B.)

1

is gay, had discouraged Mr. Iacovetta from following up on his stated desire to pursue her. (*See id.*)

   e.  Dr. John C. Okiishi states that Mr. Iacovetta "made frequent, inappropriate comments about women." (Exhibit D.  *See also* Exhibit B (observation by Dr. Joseph R. Etherage that Mr. Iacovetta "tended to speak impulsively ... about someone's physical attractiveness in a manner that was not professional").)  Dr. Okiishi reports that Mr. Iacovetta remarked of a female colleague, "I'm glad she is out sick today so we don't have to deal with her 'female problems'." (*See* Exhibit D.)  He also notes that Mr. Iacovetta asked whether a female job candidate "had 'good legs'" and would wear short skirts. (*See id.*)  Dr. Okiishi concludes his statement with the remark that he has "purposely not had [his] wife visit [him] at work because of [Mr. Iacovetta]." (*See id.*)  Dr. Okiishi explains that he feels certain that Mr. Iacovetta "would make some comment ... about my wife's looks or body," adding, "I don't want her subjected to that kind of objectification." (*See id.*)

2.  Mr. Iacovetta subjected female coworkers to unwanted and offensive physical contact.

   a.  Dr. Harmon states that Mr. Iacovetta "frequently would come up from behind and try to scare [her] by grabbing the sides of [her] body or by tickling [her] on the sides of [her] body and [her] neck." (*See* Exhibit A.)  She asserts that Mr. Iacovetta did the same to Dr. Slade. (*See id.*)

   b.  Dr. Slade corroborates Dr. Harmon's account.  She states that Mr. Iacovetta at one time "would 'rib dig' Dr. Harmon and my sides as we were sitting at our desks or as we were walking with one another," and that he later began massaging their shoulders while they were sitting at their desks. (*See* Exhibit F.)  Dr. Slade characterized the messages as " less uncomfortable than the rib digs, but still ... very inappropriate. (*See id.*)

   c.  Dr. Harmon asserts that Mr. Iacovetta persisted in tickling her even after she told him to stop. (*See* Exhibit A.)  Dr. Slade's account differs in that she states that Mr. Iacovetta stopped the "rib digs" when she and Dr. Harmon objected to his doing so, but is consistent in stating that Mr. Iacovetta persisted in giving shoulder massages. (*See* Exhibit F (statement 2).)

3.  Mr. Iacovetta's conduct contributed to negative influences and disruption of teamwork within the ABHC environment.

   a.  Mr. Iacovetta's sexually inappropriate comments disturbed and alienated his colleagues in the ABHC Program Manager's Office. (*See* Exhibits A, B, C, D, and F (statement 2).)

   b.  Mr. Iacovetta also engaged in other activities, without sexual content, that tended to disrupt teamwork within the office.

   (1)  Several witnesses state that Mr. Iacovetta made slighting or derogatory remarks about Mormons. (*See, e.g.,* Exhibits A ("Mr. Iacovetta made repeated comments about not wanting any more Mormons to be working in our office") and D (remarking that Mr. Iacovetta asked whether a potential new hire "'was a Mormon' because he didn't want any more individuals of that religious tradition working with him").  *Cf.* Exhibit F (confirming that Mr. Iacovetta did ask

2

whether the next person to be hired would be a Mormon. Drs. Harmon, Etherage, Okiishi, Jones and Slade are all Mormons. (*See* Exhibit F (statement 2).) Dr. Harmon's statement indicates that she was offended by Mr. Iacovetta's comments. (*See* Exhibit A.) The other Mormon witnesses who mention Mr. Iacovetta's remarks about their faith do not describe their reaction to his words, (*see* Exhibits D and F (statement 2)); however, one might reasonably infer that his comments did not foster a spirit of teamwork and cooperation between his Mormon colleagues and himself.

(2) Dr. Harmon relates that Mr. Iacovetta attempted to isolate her from her peers and to scapegoat her for all of the friction within the office. (*See* Exhibit A.) Dr. Etherage and Dr. Okiishi corroborate her complaint. (*See* Exhibits B and D. *See also* Exhibit C (observation by LTC Gary D. Southwell that "Drs. Harmon, Okiishi [sic] and Jones ... all expressed concern about Mr. Iacovetta's behavior, in particular toward Dr. Harmon.)

(3) Dr. Slade observes that Mr. Iacovetta made derogatory comments about gays and "fags" that she found hurtful, although she also emphasizes that he was not the only person in the office to do so. (*See* Exhibit F (statement 1).)

c.  To alleviate friction between Mr. Iacovetta and the psychologists (Dr. Harmon *et al*) LTC Southwell moved Mr. Iacovetta from the ABHC Program Manager's Office. (*See* Exhibit C.) This did not eliminate the underlying discontent, but reduced opportunities for mutual antagonisms to spark additional incidents that would further degrade the work environment.

4.  In fairness to Mr. Iacovetta, it should be noted that his behavior is not the sole cause of friction among the employees working on the ABHC and its associated programs.

a.  The statements of Dr. Slade, Mr. Iacovetta, Ms. Naomi Croce, and LTC Andrew J. Smith all illustrate personality conflicts between two cliques—employees who stayed with the original ABHC program and those who moved to the recently-formed Program and Research Service (PARS) within the Madigan Department of Psychology. Dr. Slade and LTC Smith attribute part of the conflict to Dr. Etherage, the chief of PARS. (*See* Exhibits F and H.)

b.  Relations between the two cliques worsened after Mr. Iacovetta raised concerns about a proposal, advanced by Dr. Etherage and the Madigan Department of Psychology, to automate a behavioral health questionnaire for use in ABHC. (*See* Exhibits G and H.) The us Army Medical Command legal office opined that (b)(5)

(b)(5)                           (*See* Exhibit H.) The ABHC program was already under investigation for an apparent violation of the ADA. (*See id.*) The command did not wish to incur a second investigation and therefore declined to automate the questionnaire. (*Id.*) This outcome, combined with the stress induced by the ongoing ADA investigation, exacerbated a growing divide between Dr. Etherage and the providers who followed him into PARS, and Mr. Iacovetta and the personnel who stayed with him at ABHC. (*See* Exhibits G and H.)

5.  It should also be noted that Dr. Harmon did not complain to her superiors about Mr. Iacovetta's conduct until after Mr. Iacovetta had communicated to LTC Southwell his concerns

about the apparent rift developing among the personnel supporting the ABHC program. (*See* Exhibits A, B, C, and G.)

a.   Dr. Harmon perceived Mr. Iacovetta's comments to be part of a larger attack on her personally. (*See* Exhibit A. *See also* Exhibit B (characterizing Mr. Iacovetta's comments to LTC Southwell as an accusation of misconduct leveled against Drs. Harmon, Jones, and Okiishi).)

b.   Mr. Iacovetta claims that Dr. Harmon then brought her complaint against him only because she had felt herself attacked. (*See* Exhibit G.) He notes that the acts of which Dr. Harmon complained spanned a period of some 18 months, during which she voiced no complaints to him, or to their superiors. (*See id.*) Mr. Iacovetta's claim to have received no notice that Dr. Harmon found his conduct unacceptable is contradicted to an extent by the statements of Drs. Harmon and Slade, in which each states that they told him not to tickle or poke them. The record clearly confirms, however, that Dr. Harmon raised no complaint officially until September 2010.

c.   That Dr. Harmon did not immediately report the misconduct she attributes to Mr. Iacovetta does not in this case diminish the credibility of her complaint. She plausibly explains why she did not complain at the outset. Moreover, her account is substantially corroborated by several other witnesses, and contradicted only partially by Mr. Iacovetta, whose own statement lacks similar corroboration. Nor does this apparent delay excuse or diminish the impropriety of Mr. Iacovetta's misconduct. One may reasonably conclude, however, that Dr. Harmon's frustration was aggravated by the legal uncertainty plaguing the ABHC project, to which Mr. Iacovetta contributed by questioning the proposal to automate the questionnaire. It also follows logically that, in responding to the complaint in which Mr. Iacovetta linked her to division within the office, she would express her own grievances against him in the strongest possible terms.

4

Page 9

**CONTINUATION SHEET: DA FORM 1574, SECTION V (RECOMMENDATIONS)**

In light of the above findings, I recommend—

(b)(5)



**DEPARTMENT OF THE ARMY**
MADIGAN ARMY MEDICAL CENTER
9040 JACKSON AVENUE
TACOMA, WASHINGTON 98431-1100

Page 10

REPLY TO
ATTENTION OF:

MCHJ-CO

6 October 2010

MEMORANDUM FOR LTC Spencer Dickens, Madigan Army Medical Center, 9040 Jackson Avenue, Tacoma, Washington 98431-1100

SUBJECT: Appointment as an Investigating Officer

1. References: Army Regulation 15-6, Procedures for Investigating Officers and Boards of Officers, 2 October 2006.

2. You are hereby appointed as an investigating officer pursuant to Army Regulation 15-6. You are to conduct an informal investigation to determine the facts and circumstances surrounding acts of sexual harassment and religious discrimination allegedly committed by Mr. Glenn Iacovetta, the Program Manager for the Automated Behavioral Health Clinic (ABHC), against the complainant, Dr. Cory Harmon, and other personnel in the ABHC Program Management Office (PMO). You will also conduct a general assessment of the working environment within the ABHC PMO.

   a. In addressing the allegations against Mr. Iacovetta, your findings will identify specifically any credible evidence of improper conduct that he may have undertaken against the complainant or her co-workers, and the basis upon which you conclude that such actions did, or did not, amount to sexual harassment or religious discrimination. You will also comment on the impact, if any, on the work environment of the ABHC PMO of any confirmed acts of misconduct by Mr. Iacovetta. All findings must be supported by a preponderance of the evidence.

   b. In assessing the general work environment of the ABCH PMO, you will focus on major factors exerting positive or negative influences over the office.

       (1) Do not allow yourself to be diverted into investigating minor interpersonal disputes.

       (2) In addressing negative influences within the ABHC PMO, identify significant sources of disruption to teamwork and office harmony, whether or not related to the misconduct that the complainant has attributed to Mr. Iacovetta.

       (3) Your findings will include—but need not be limited to—a determination of whether the ABHC PMO staff has divided factionally. If you find that factional division has occurred, you will comment on the extent of that division, its probable causes, and its impact on the office.

       (4) All findings in the assessment must be supported by a preponderance of the evidence.



MCHJ-JA
SUBJECT: Appointment as an Investigating Officer

c. In formulating your recommendations, you will consider whether the command should seek corrective or disciplinary action against any individual, and whether any individual is entitled to redress. You will also consider whether more extensive corrective actions are needed to ameliorate a negative or hostile work environment within the ABHC PMO. All recommendations must be consistent with, and supported by, your findings.

3. You will interview any witnesses whom you believe may possess relevant information. You will take sworn statements from witnesses using DA Form 2823. These statements will be typed whenever practicable. You will also secure copies of any documents that might substantiate or refute the testimony of the complainant, the subject (Mr. Iacovetta), or any named witness.

4. If, in the course of your investigation, you come to suspect that any military service member whom you wish to interview has committed a crime or assisted in the commission of a crime, you must advise the individual of his or her rights under Article 31, UCMJ or the Fifth Amendment, as appropriate. Use a DA Form 3881 when conducting rights advisements.

5. If persons being interviewed are federal civilian employees, you must first determine whether they are covered by a collective bargaining agreement or are a member of a union, in which case they may have the right to have a union representative present during the interview. A union representative must be given the opportunity to be present at any examination of a covered employee if the employee reasonably believes the examination may result in disciplinary action against him/her and if the employee requests representation. If a union representative is present, the employee should be permitted to consult with the representative. However, the representative is not entitled to answer for the employee. Employees may waive this right.

6. Upon receipt of these orders, contact (b)(6) _____ the Center Judge Advocate, Madigan Army Medical Center, to receive a legal briefing before you start your investigation.

7. Submit your report to me using DA Form 1574 NLT 21 October 2010. You will obtain a legal review from the Office of the Center Judge Advocate, Madigan Army Medical Center, prior to submission. If you require additional time, submit a request to me, through (b)(6) _____ explaining why you need an extension.

JEROME PENNER III
COL, MS
Commanding

2

# Appendix B

**REPORT OF PROCEEDINGS BY INVESTIGATING OFFICER/BOARD OF OFFICERS**

For use of this form, see AR 15-6; the proponent agency is OTJAG.

Page 3

*IF MORE SPACE IS REQUIRED IN FILLING OUT ANY PORTION OF THIS FORM, ATTACH ADDITIONAL SHEETS*

**SECTION I - APPOINTMENT**

Appointed by   **MEDCOM Chief of Staff**

(Appointing authority)

on   **22 Sept 2011**   (Attach inclosure 1: Letter of appointment or summary of oral appointment data.) (See para 3-15, AR 15-6.)

(Date)

**SECTION II - SESSIONS**

The   (investigation) (board)   commenced at   **Western Regional Medical Command**   at   **0900**

(Place)                                   (Time)

on   **30 Sept 2011**   (If a formal board met for more than one session, check here ☐. Indicate in an inclosure the time each session began and

(Date)

ended, the place, persons present and absent, and explanation of absences, if any.) The following persons (members, respondents, counsel) were

present: (After each name, indicate capacity, e.g., President, Recorder, Member, Legal Advisor.)

The following persons (members, respondents, counsel) were absent: (Include brief explanation of each absence.) (See paras 5-2 and 5-8a, AR 15-6.)

The   (investigating officer) (board)   finished gathering/hearing evidence at   **1700**   on   **9 Nov 2011**

(Time)                              (Date)

and completed findings and recommendations at   **1800**   on   **10 Nov 2011**

(Time)                              (Date)

**SECTION III - CHECKLIST FOR PROCEEDINGS**

| A. COMPLETE IN ALL CASES | YES | NO1/ | NA2/ |
|---|---|---|---|
| 1  Inclosures  (para 3-15, AR 15-6) | | | |
| Are the following inclosed and numbered consecutively with Roman numerals:  (Attached in order listed) | | | |
| a.  The letter of appointment or a summary of oral appointment data? | ✓ | | |
| b.  Copy of notice to respondent, if any? (See item 9, below) | | | ✓ |
| c.  Other correspondence with respondent or counsel, if any? | | | ✓ |
| d.  All other written communications to or from the appointing authority? | ✓ | | |
| e.  Privacy Act Statements (Certificate, if statement provided orally)? | ✓ | | |
| f.  Explanation by the investigating officer or board of any unusual delays, difficulties, irregularities, or other problems encountered  (e.g., absence of material witnesses)? | ✓ | | |
| g.  Information as to sessions of a formal board not included on page 1 of this report? | | | ✓ |
| h.  Any other significant papers (other than evidence)  relating to administrative aspects of the investigation or board? | | | ✓ |

*FOOTNOTES:  1/ Explain all negative answers on an attached sheet.*

*2/ Use of the N/A column constitutes a positive representation that the circumstances described in the question did not occur in this investigation or board*

**DA FORM 1574, MAR 1983**          EDITION OF NOV 77 IS OBSOLETE.          *Page 1 of 4 pages*          APD PE v1.30

Page 4

| 2 | Exhibits *(para 3-16, AR 15-6)* | YES | NO[1] | NA[2] |
|---|---|---|---|---|
| | a. Are all items offered *(whether or not received)* or considered as evidence individually numbered or lettered as exhibits and attached to this report? | ✓ | | |
| | b. is an index of all exhibits offered to or considered by investigating officer or board attached before the first exhibit? | ✓ | | |
| | c. Has the testimony/statement of each witness been recorded verbatim or been reduced to written form and attached as an exhibit? | ✓ | | |
| | d. Are copies, descriptions, or depictions *(if substituted for real or documentary evidence)* properly authenticated and is the location of the original evidence indicated? | | | ✓ |
| | e. Are descriptions or diagrams included of locations visited by the investigating officer or board *(para 3-6b, AR 15-6)?* | | | ✓ |
| | f. is each written stipulation attached as an exhibit and is each oral stipulation either reduced to writing and made an exhibit or recorded in a verbatim record? | | | ✓ |
| | g. If official notice of any matter was taken over the objection of a respondent or counsel, is a statement of the matter of which official notice was taken attached as an exhibit *(para 3-16d, AR 15-6)?* | | | ✓ |
| 3 | Was a quorum present when the board voted on findings and recommendations *(paras 4-1 and 5-2b, AR 15-6)?* | | | ✓ |
| **B. COMPLETE ONLY FOR FORMAL BOARD PROCEEDINGS** *(Chapter 5, AR 15-6)* | | | | |
| 4 | At the initial session, did the recorder read, or determine that all participants had read, the letter of appointment *(para 5-3b, AR 15-6)?* | | | |
| 5 | Was a quorum present at every session of the board *(para 5-2b, AR 15-6)?* | | | |
| 6 | Was each absence of any member properly excused *(para 5-2a, AR 15-6)?* | | | |
| 7 | Were members, witnesses, reporter, and interpreter sworn, if required *(para 5-3a, AR 15-6)?* | | | |
| 8 | If any members who voted on findings or recommendations were not present when the board received some evidence, does the inclosure describe how they familiarized themselves with that evidence *(para 5-2d, AR 15-6)?* | | | |
| **C. COMPLETE ONLY IF RESPONDENT WAS DESIGNATED** *(Section II, Chapter 5, AR 15-6)* | | | | |
| 9 | Notice to respondents *(para 5-5, AR 15-6):* | | | |
| | a. Is the method and date of delivery to the respondent indicated on each letter of notification? | | | |
| | b. Was the date of delivery at least five working days prior to the first session of the board? | | | |
| | c. Does each letter of notification indicate — | | | |
| | (1)   the date, hour, and place of the first session of the board concerning that respondent? | | | |
| | (2)   the matter to be investigated, including specific allegations against the respondent, if any? | | | |
| | (3)   the respondent's rights with regard to counsel? | | | |
| | (4)   the name and address of each witness expected to be called by the recorder? | | | |
| | (5)   the respondent's rights to be present, present evidence, and call witnesses? | | | |
| | d. Was the respondent provided a copy of all unclassified documents in the case file? | | | |
| | e. If there were relevant classified materials, were the respondent and his counsel given access and an opportunity to examine them? | | | |
| 10 | If any respondent was designated after the proceedings began *(or otherwise was absent during part of the proceedings):* | | | |
| | a. Was he properly notified *(para 5-5, AR 15-6)?* | | | |
| | b. Was record of proceedings and evidence received in his absence made available for examination by him and his counsel *(para 5-4c, AR 15-6)?* | | | |
| 11 | Counsel *(para 5-6, AR 15-6):* | | | |
| | a. Was each respondent represented by counsel? | | | |
| | Name and business address of counsel: | | | |
| | *(if counsel is a lawyer, check here ☐ )* | | | |
| | b. Was respondent's counsel present at all open sessions of the board relating to that respondent? | | | |
| | c. If military counsel was requested but not made available, is a copy *(or, if oral, a summary)* of the request and the action taken on it included in the report *(para 5-6b, AR 15-6)?* | | | |
| 12 | If the respondent challenged the legal advisor or any voting member for lack of impartiality *(para 5-7, AR 15-6):* | | | |
| | a. Was the challenge properly denied and by the appropriate officer? | | | |
| | b. Did each successfully challenged cease to participate in the proceedings? | | | |
| 13 | Was the respondent given an opportunity to *(para 5-8a, AR 15-6):* | | | |
| | a. Be present with his counsel at all open sessions of the board which deal with any matter which concerns that respondent? | | | |
| | b. Examine and object to the introduction of real and documentary evidence, including written statements? | | | |
| | c. Object to the testimony of witnesses and cross-examine witnesses other than his own? | | | |
| | d. Call witnesses and otherwise introduce evidence? | | | |
| | e. Testify as a witness? | | | |
| | f. Make or have his counsel make a final statement or argument *(para 5-9, AR 15-6)?* | | | |
| 14 | If requested, did the recorder assist the respondent in obtaining evidence in possession of the Government and in arranging for the presence of witnesses *(para 5-8b, AR 15-6)?* | | | |
| 15 | Are all of the respondent's requests and objections which were denied indicated in the report of proceedings or in an inclosure or exhibit to it *(para 5-11, AR 15-6)?* | | | |

FOOTNOTES:  1/ Explain all negative answers on an attached sheet.
2/ Use of the N/A column constitutes a positive representation that the circumstances described in the question did not occur in this investigation or board.

Page 2 of 4 pages, DA Form 1574, Mar 1983

APD PE v1.30

| SECTION IV - FINDINGS   *(para 3-10, AR 15-6)* |
|---|

The  *(investigating officer) (board)*  , having carefully considered the evidence, finds:

See attached findings narrative

| SECTION V - RECOMMENDATIONS   *(para 3-11, AR 15-6)* |
|---|

In view of the above findings, the *(investigating officer) (board)* recommends:

See attached recommendations

APD PE v1.30

**SECTION VI - AUTHENTICATION**   (para 3-17, AR 15-6)

THIS REPORT OF PROCEEDINGS IS COMPLETE AND ACCURATE. *(If any voting member or the recorder fails to sign here or in Section VII below, indicate the reason in the space where his signature should appear.)*

_____
(Recorder)

_____
(Investigating Officer) (President)

_____
(Member)

_____
(Member)

_____
(Member)

_____
(Member)

**SECTION VII - MINORITY REPORT**   (para 3-13, AR 15-6)

To the extent indicated in inclosure _____ , the undersigned do(es) not concur in the findings and recommendations of the board. *(In the inclosure, identify by number each finding and/or recommendation in which the dissenting member(s) do(es) not concur. State the reasons for disagreement. Additional/substitute findings and/or recommendations may be included in the inclosure.)*

_____
(Member)

_____
(Member)

**SECTION VIII - ACTION BY APPOINTING AUTHORITY**   (para 2-3, AR 15-6)

The findings and recommendations of the (investigating officer) (board) are (approved) (disapproved) (approved with following exceptions) (substitutions.) *(If the appointing authority returns the proceedings to the investigating officer or board for further proceedings or corrective action, attach that correspondence (or a summary, if oral) as a numbered inclosure.)*

FINDINGS:

On page 3 in paragraph f, line 3, substitute the words "Dr. Slade" for "Dr. Harmon"

RECOMMENDATIONS:

The recommendations are disapproved in total and the following substituted therefore:

1. The findings of this investigation be provided to Mr. Iacovetta's chain of supervision for consideration of appropriate action, if any. Recommend that any supervisor who provided a letter of support for Mr. Iacovetta appropriately recuse themselves from any decision making role in this determination.

2. To the extent he remains employed at MEDCOM, recommend Mr. Iacovetta be disassociated from MEDCOM/ABHC, and that his work relationship to Mr. West be severed.

3. Recommend MEDCOM senior leadership engage and ameliorate the concerns and loss of trust incurred by Dr. Slade, Dr. Harmon, and Ms. Croce. These women must understand the aberrant work context they found themselves in does not reflect a military culture; rather, Mr. Iacovetta's behavior reflected a deviant work environment.

4. That Dr. Slade and Ms. Croce are reinstated to the ABHC if they wish it and that Ms. Croce's appointment be extended to the four-year maximum. Should Ms. Croce not wish to be reinstated to ABHC her appointment should still be extended to the four-year maximum.

HERBERT A. COLEY
CHIEF OF STAFF
ARMY MEDICAL COMMA.

The findings and recommendations of the investigating officer are approved with following exceptions/ substitutions.

Findings:

On page 3 in paragraph f, line 3, substitute the words "Dr. Slade" for "Dr. Harmon"

**RECOMMENDATIONS:**

The recommendations are disapproved in total and the following substituted therefore:

1. The findings of this investigation be provided to Mr. Iacovetta's chain of supervision for consideration of appropriate action, if any. Recommend that any supervisor who provided a letter of support for Mr. Iacovetta appropriately recuse themselves from any decision making role in this determination.

2. To the extent he remains employed at MEDCOM, recommend Mr. Iacovetta be disassociated from MEDCOM/ABHC, and that his work relationship to Mr. West be severed.

3. Recommend MEDCOM senior leadership engage and ameliorate the concerns and loss of trust incurred by Dr. Slade, Dr. Harmon, and Ms. Croce. These women must understand the aberrant work context they found themselves in does not reflect a military culture; rather, Mr. Iacovetta's behavior reflected a deviant work environment.

4. That Dr. Slade and Ms. Croce are re-instated to the ABHC if they wish it and that Ms Croce's appointment be extended to the four year maximum. Should Ms. Croce not wish to be reinstated to ABHC her appointment should still be extended to the four year maximum.

**Continuation Sheet**
**DA Form 1574**
**SECTION IV – FINDINGS**

To put this investigation in context, this AR 15-6 investigation is the third investigation of alleged sexual harassment by Mr. Glenn Iacovetta. The first investigation was an AR 15-6 Investigation that was conducted by LTC Spencer Dickens, and for which the findings and recommendations were approved by COL Jerome Penner in the spring of 2011 (hereafter, "previous AR 15-6 investigation") (Exhibit A). That investigation substantiated the allegations that Mr. Iacovetta committed several incidents of sexual harassment (b)(6) | After that investigation was completed, additional allegations of sexual harassment by Mr. Iacovetta surfaced, as well as allegations of misconduct by Mr. Johnny West. There was thus an Informal Inquiry conducted (the second investigation) to make a preliminary determination of whether the additional allegations against Mr. Iacovetta and the allegations concerning Mr. West were credible (Ex. C).

This AR 15-6 investigation addresses incidents for which no findings were made in the first AR 15-6 investigation. In other words, none of the incidents described in the findings below were addressed in the previous AR 15-6 Investigation.

**FINDINGS:**

1. *Mr. Iacovetta did sexually harass (as that term is defined in AR 600-20, Chapter 7 (Ex. D)) subordinate employees at the AHBC, by creating a hostile work environment.* Although he denied creating a hostile work environment (Ex. E, p. 1), the greater weight of the evidence is that Mr. Iacovetta did create a hostile work environment at the ABHC, as evidenced by the following:

   a. *In January or February of 2010, Mr. Iacovetta asked one of his subordinate employees, Dr. Karstin Slade, what her bra size is.* Dr. Slade credibly describes an incident in which Mr. Iacovetta asked her about her bra size. (Ex. F, p. 12). Dr. Harmon states that Dr. Slade had previously mentioned this incident to her, as well (Ex. G, p. 6).

   b. *Mr. Iacovetta discussed with Dr. Slade the fact that he had 19 affairs (Ex. F, p. 23).* Although Mr. Iacovetta denied describing his sexual history to Dr. Slade (Ex. E, p. 1), the greater weight of the evidence supports a finding that he did make this statement. Mr. Iacovetta does admit to discussing with Dr. Slade a single affair that he had while on active duty (b)(6)

1

(b)(6) _____ Mr. Iacovetta states that he took full responsibility for this. (Ex. E, p. 2). However, I find Dr. Slade to be more credible than Mr. Iacovetta, thus I believe her account over his.

Reasons I attribute credibility to Dr. Slade is that several incidents she described although denied by Mr. Iacovetta, were substantiated, specifically his denial of requesting to see her testimony, which proved false, and his denial of pursing a relationship with Dr. Bickel, which also proved false (see below). With respect to multiple affairs; it appears that this is in concert with testimony of former officers he was assigned with who verify his history of indiscretions which further substantiates the plausibility that he conveyed these scenarios to Dr. Slade.

c. *Early one morning, Dr. Harmon overheard Mr. Iacovetta making sounds as if he was masturbating in his office (Ex. G, p. 4). When confronted by Dr. Slade about this incident, Mr. Iacovetta did not deny that the incident occurred, but rather stated that the incident occurred before work hours (Ex G, p. 4; Ex. F, p. 13).* Although Mr. Iacovetta denied that this event occurred (Ex. E, p. 1), the greater weight of the evidence supports a finding that it did occur. Mr. Iacovetta admits that Dr. Slade had discussed this incident with him previously (Ex. E, p. 1), at which time he denied that it happened.

In the course of the interviews conducted by this investigator, Dr. Harmon proved to be consistently reliable in the answers she rendered. Dr. Slade, although not forthcoming in her first testimony rendered in the previous 15-6 investigation, provided information readily corroborated by this investigator, specifically the issue surrounding Mr Iacovetta's request to review her testimony and his denial of pursuing a relationship with Dr. Bickel. Mr. Iacovetta's denials of corroborated information undermine his credibility.

d. *Mr. Iacovetta inappropriately engaged in tickling of Ms. Croce and poking her in the ribs during the time she was applying for her job at the ABHC (Ex. H, pp. 13-14).* Although Mr. Iacovetta denied that he ever tickled Ms. Croce (Ex. E, p. 1), the greater weight of the evidence supports a finding that he did engage in this conduct. I find Ms. Croce more credible than Mr. Iacovetta. Its important to note that this behavior had occurred with other employees thus rendering more weight to Croce's testimony. (Ex G, p.3; Ex U pp. 3-7).

Of interest is the testimony of Ms. Katherine Babb, who does not attribute sexual impropriety to Mr. Iacovetta; nevertheless, she had to set limits with respect to Mr. Iacovetta's behavior (Ex U, pp. 3, 4, 6 & 7). She described his behavior as "Peter Pan"

2

behavior. In this instance it was construed as more benign. Ms. Babb is a retired Army Colonel and firmly set limits that quickly established a clear boundary; nonetheless, contextually the dynamics were different with Ms. Croce who was in a more dependent role confronting the perceived power gradient and influence welded by Mr Iacovetta. Ms. Croce's allegation of sexual harassment type behavior transpired during her interview in the hiring phase. This previously undisclosed allegation raises significant concern as this was conducted during the time she was applying for a job. This very bizarre interaction during the hiring phase was not reported during the initial 15-6 due to Ms. Croce's fear of losing her job. Additionally, she didn't protest the behavior when it occurred because she did not want to compromise her chance to obtain employment. Ms. Croce in her statement also conveyed the fact that she had recently lost her job so obtaining employment was crucial thus rendering her vulnerable and consequently her silence; she was afraid to risk obtaining employment by confronting Mr. Iacovetta's inappropriate touching during the application phase while seeking employment

e. *Mr. Iacovetta asked Dr. Slade to wear skirts to work.* Dr. Slade credibly stated that in December 2010, Mr. Iacovetta asked her to wear skirts to work while they were proliferating the training for the ABHC (Ex. F, p. 12). Although Mr. Iacovetta denied making this statement (Ex. E, p. 1), the greater weight of the evidence supports a finding that Mr. Iacovetta did make this statement.

f. *Mr. Iacovetta told Dr. Slade that he had had sex in the office multiple times.* Dr. Slade states that Mr. Iacovetta told her he had sex in the office multiple times with a woman from Idaho (Ex. F, p. 13). When Dr. Harmon reminded Mr. Iacovetta that she had to go back and work in the office in which he was having sex, Mr. Iacovetta told her, "That's what you get for taking [my] old office" (Ex. F, 13). Although he denies telling Dr. Slade this (Ex. E, p. 2), the greater weight of the evidence supports a finding that he did. I find Dr. Slade to be more credible than Mr. Iacovetta

g. *Mr. Iacovetta described in graphic detail to Dr. Slade an incident in which he had digital intercourse with a woman in the back of a movie theater while he was in Atlanta.* Although Mr. Iacovetta states he "has no idea what this is about" (Ex. E, p. 2), the greater weight of the evidence supports a finding that he did make these statements. Dr. Slade was very credible in explaining the circumstances under which Mr. Iacovetta described this incident and its effect on her (Ex. F, p. 14) As a result of this conversation, Dr. Slade stated she felt even more unsettled by Mr. Iacovetta's comment that she should wear more skirts to work. (Ex. F, p. 14).

3

*2. There is insufficient evidence to support a finding that Mr. Iacovetta reprised or attempted to reprise against civilian employees at ABHC. Additionally, there is insufficient evidence to find that Mr. West reprised or attempted to reprise against civilian employees at ABHC.* While it is clear that Dr. Slade and Ms. Croce believe that they have been treated unfairly as a result of their involvement in the previous AR 15-6 investigation, none of the ostensibly adverse actions with respect to those two employees can be linked to Mr. Iacovetta or Mr. West.

Mr. Iacovetta made frequent disparaging remarks about Dr. Harmon according to Dr. Slade. His unremitting critique of her likely had an effect of other members within ABHC and likely tempered the forthrightness and candor of their testimonies. Dr. Slade's testimony is illustrative to the threatening nature of these statements.

- On a couple of occasions he stated that he hoped he didn't run into Dr. Harmon because he is not sure what he would do to her.
- He stated that Dr. Harmon would regret filing this statement. He also made these sorts of threats about Dr. Etherage and his claims against Mr. West and PARS' attempts to sabotage the ABHC program. (Ex C, Slade testimony p.5)

*3. There is insufficient evidence to find that Mr. Iacovetta discriminated against potential hires at ABHC based on their race, gender, color, natural origin, or religious affiliation. However, I do find that Mr. Iacovetta used his position at ABHC to attempt to secure a date with a professional employee who wanted to transfer to the ABHC.*

- a. *Mr. Iacovetta expressed interest in pursuing a relationship with Dr. Kelly Bickel while she was considering moving from the PRMC Fusion Cell to the ABHC (Ex. I, p. 2).*

- Although Mr. Iacovetta denies that he ever discussed having a more intimate relationship with Dr. Bickel (Ex. E, p. 1), the greater weight of the evidence supports a finding that he did pursue such a relationship. While Dr. Bickel does not believe that Mr. Iacovetta engaged in any misconduct by pursuing a relationship with her, she describes in some detail how the conversation took place (Ex. I, p. 2). She credibly explains that she was flattered by Mr. Iacovetta's attempts, but that she rejected his advances (Ex. I, p. 2). Also, while Mr. Iacovetta denied that he expressed interest in pursuing a relationship with Dr. Bickel (Ex. E), Dr. Slade states that Mr. Iacovetta told her that Dr. Bickle engaged in "inappropriate flirting behaviors" and that Mr. Iacovetta reported that Dr. Bickle

4

had "kissed him back in May of 2009" (Ex. F, p. 25). Further, Dr. Bickel mentioned this incident to Dr. Harmon (Ex. G, pp. 4, 15).

- Mr. Iacovetta's conduct towards Dr. Bickel did not amount to sexual harassment, however, because Dr. Bickel did not consider his actions to be unwelcome (Ex. I, p. 2).

4. *Mr. Iacovetta did attempt to improperly influence a lawful investigation into allegations that he had sexually harassed fellow employees and subordinates at ABHC.*

    a. *Mr. Iacovetta misled Dr. Slade concerning the scope of the previous AR 15-6 investigation, thus causing her to omit relevant details from her initial statement.* Dr. Slade states that Mr. Iacovetta told her that the initial AR 15-6 investigation concerned his "recent short and grumpy behavior, rather than his inappropriate comments and physical touching." (Ex. F, p. 4). This caused Dr. Slade to withhold information from her first statement (Ex F, p. 8).

    b. *Mr. Iacovetta asked Dr. Slade, who was one of his subordinate employees, to provide him with a copy of her first statement in the previous AR 15-6 investigation, and Dr. Slade did provide him with a copy of that statement.* Dr. Slade states Mr. Iacovetta asked to see her written statement before she turned it in to the Investigating Officer (Ex. F, pp. 4-5, 7, 10). Dr. Slade states that she was "worried that if I didn't show it to Mr. Iacovetta, Mr. Iacovetta would assume that I was not supportive of him" (Ex. F, p. 10). Mr. Iacovetta denies ever having asked Dr. Slade for a copy of her statement (Ex. E, p. 2), but the greater weight of the evidence supports a finding that he did request a copy of the first statement she gave in the previous AR 15-6 investigation. I find Dr. Slade more credible than Mr. Iacovetta.

    c. *Mr. Iacovetta also asked Dr. Slade on multiple occasions to provide him a copy of her second statement in the previous AR 15-6 investigation, but Dr. Slade did not provide him with a copy (Ex. F, p. 7).* Mr. Iacovetta denies ever having asked Dr. Slade for a copy of her statement (Ex. E, p. 2). However, Dr. Slade produced an email indicating that on 1 November 2010, Mr. Iacovetta requested to see her statement (Ex. J). This email greatly undermined Mr. Iacovetta's credibility. Further, Dr. Slade credibly testifies that Mr. Iacovetta preceded this written request more than one verbal request to see her statement (Ex. F, p. 10).

5. *There is insufficient evidence to find that Mr. West used his position at Headquarters, United States Army Medical Command (MEDCOM) to improperly influence hiring or promotion decisions at ABHC.*

   a. *While Mr. West admits that he recommended Mr. Iacovetta into the ABHC position without disclosing Mr. Iacovetta's prior misconduct, Mr. West also recommended two other individuals (Ex. K-1, p. 3).*

   b. *While there is much speculation and rumor that Mr. West orchestrated Mr. Iacovetta's relocation to the Child Adolescent Behavioral Health Office, there is insufficient evidence to support a finding that Mr. West had any official involvement in this move.*

   c. *Similarly, there is speculation and rumor that Mr. West orchestrated Dr. Slade's and Ms. Croce's dislocation from the ABHC program, but there is insufficient evidence to support a finding that Mr. West had any official involvement in these moves; however the ambiguity regarding who actually made the decision is a major concern.*

   Dr. David Orman, Chief of the Behavioral Health System of Care Integration Office at MEDCOM HQ, and Mr. West each stated they had no influence in the decision making process that effectively displaced Dr. Slade and Ms. Croce from the ABHC program (Tab L, p.5; Tab K-1, p.8). Dr. John Miller, an employee of the Behavioral Health System of Care Integration Office cell located at MAMC, unequivocally attributed the decision for displacing Dr. Slade and Ms. Croce to Dr. Orman (Ex. M, pp. 3, 4). This investigator finds it disconcerting that no individual acknowledges responsibility for the decision that ultimately displaced Dr. Slade and Ms. Croce from the program (Ex 3). The process was a source of consternation to the aggrieved individuals.(Ex T, p.5)

6. *Mr. Johnny West used his position at Headquarters, MEDCOM to attempt to improperly influence an investigation against Mr. Glenn Iacovetta.*

   a. *Mr. West did attempt to influence the previous AR 15-6 investigation while it was being conducted.* While the previous investigation was pending, Mr. West sent an email to COL Richard David (the Deputy Commander for Administration at MAMC) and COL Dennis LeMaster (the MAMC Chief of Staff) inquiring about the investigation (Ex. N, p. 2). Although the AR 15-6 investigation was not in COL David's lane, he said he felt pressured by Mr. West because Mr. West had been COL David's senior officer while Mr. West was still on active duty (Ex. N, p. 2).

b. *Additionally, Mr. West used his position at Headquarters, MEDCOM, to attempt to influence the adverse action that would be taken against Mr. Iacovetta as a result of the previous AR 15-6 investigation.*

- Mr. West stated that he had no involvement in either appointing or approving the prior AR 15-6 investigation and that he didn't "know anything about the investigation; who did it, how it was done." (Ex. K-1, p, 2). Yet, Mr. West sent an email message to the Deputy Commander for Administration at MAMC (COL David) on June 10, 2011 attempting to intercede on Mr. Iacovetta's behalf (Ex. O). Mr. West explains that his intent in sending the email was to find out when his office was going to be able to move the ABHC office out of the Behavioral Health Department and over to the Western Region (Ex. K-1, p. 11). However, the email Mr. West wrote to COL David is much more about the fate of Mr. Iacovetta than it is about moving the ABHC to the Western Region: "Do not let Glenn Iacovetta get rail roaded!...Please step in and save a public servants [sic] career....We have plans and a real need for Glenn in the proliferation of ABHC...he is good at managing the program.....(You as well as anyone can appreciate his hard charging mentality-dedication)...Help...." (Ex. O).

- Mr. West appears to have a blind spot when it comes to Mr. Iacovetta's shortcomings. With respect to the previous AR 15-6 investigation, Mr. West stated that he understood that "Mr. Iacovetta was essentially cleared of any significant wrongdoings," but at the same time he acknowledges that Mr. Iacovetta was ^(b)(6)

  ^(b)(6)                         A reasonably objective observer would recognize that Mr. Iacovetta must have engaged in serious misconduct to have received ^(b)(6)                         Mr. West either intentionally ignores or is unable to recognize Mr. Iacovetta's failings and misconduct.

- Mr. West is disingenuous concerning his stated intent in sending the 10 June 2011 email to COL David (Ex. O). Mr. West denies that he was asking COL David to intervene, "I knew that he was not in the decision-making process (Ex. K-1, p. 12). However, the clear wording of the email to COL David is directive in nature: "Do not let Glenn Iacovetta get rail roaded!...You have kept this whole situation at 'extended' arms [sic] length...Please step in and save a dedicated servants [sic] career...Help [Ex. O]." Further, although he took no action as a result of receiving Mr. West's email, COL David

repeatedly stated that he felt that Mr. West was pressuring him (Ex. N, pp. 2, 3, 5).

- Mr. West mislead the MAMC Deputy Commander for Clinical Services, COL Stephen Yoest, with respect to Mr. Iacovetta's background, in an attempt to save Mr. Iacovetta's job (COL Yoest was the Deciding Official concerning Mr. Iacovetta's disciplinary action (Ex. B)). Mr. West sent a letter dated 31 May 2011 to COL Yoest in which Mr. West explains that while he and Mr. Iacovetta served on active duty together in 2004-2005, Mr. Iacovetta's "performance of duties and conduct were exceptional" (Ex. P). (b)(6)

  (b)(6)

  (b)(6) Despite acknowledging that he was aware of this prior misconduct by Mr. Iacovetta, Mr. West stood by his comment that Mr. Iacovetta's conduct was "exceptional," attributing his misconduct to a "character flaw" (Ex K-1, p. 10). Notwithstanding Mr. West's actions, COL Yoest did not feel that he was being pressured, nor did he feel that anyone was trying to influence him (Ex. Q, p. 8).

- Mr. West disingenuously denies that he was attempting to influence the outcome of the investigation with respect to Mr. Iacovetta. Mr. West states in his second statement, "Did I try to influence the command at Madigan, Fort Lewis, Western Region, to go easy, or go light, or to discharge this thing on Glenn Iacovetta? No." (Ex. K-2, p. 4). However, Mr. West knew that COL Yoest was contemplating terminating Mr. Iacovetta, so Mr. West sent the 31 May 2011 letter to COL Yoest, in which Mr. West implores, "Without Glenn running the show, pushing the right buttons, ABHC will struggle...Keeping Glenn Iacovetta as a government employee is essential...(Ex. P)" Mr. West was clearly intending to influence COL Yoest to "go light" on Mr. Iacovetta.

- The fact that 15-16 other individuals, besides Mr. West, wrote letters in support of Mr. Iacovetta (Ex. Q, p. 4) does not mitigate Mr. West's conduct.

There is no indication that any of those other letter-writers were aware of Mr. Iacovetta's previous documented and serious misconduct.

- COL Yoest states that he was aware of allegations that Mr. West was using his influence to try to stop the previous AR 15-6 investigation or to try and support Mr. Iacovetta or to try to stop the action against Mr. Iacovetta (Ex. Q, p. 4). COL Yoest believes he heard that information from COL David (Ex. Q, p. 4).

c. *There is insufficient evidence to find that Mr. Iacovetta has "dirt" on Mr. West and thus Mr. West is obligated to protect him.* The sole source of this information is Mr. Iacovetta, and I do not find him to be credible.

*7. There is insufficient evidence to find that Mr. Johnny West created a hostile work environment or otherwise sexually harassed any employee and/or subordinates at ABHC.*

Statements attributed to Mr. West were ostensibly conveyed to staff by Mr. Iacovetta. Mr. West denies having made these statements (Ex K-1; K-2). Mr. Iacovetta's lack of credibility does not warrant lending substance to allegations of statements made by Mr. West that Mr. Iacovetta allegedly made to Dr. Harmon and Dr. Slade.

**RECOMMENDATIONS:**



(b)(5)

**Additional Information:**

It is imperative that the appointing authority understand that this ROI does not reflect the extensive background information that occurred during this investigation. (b)(5),(b)(6)

(b)(5),(b)(6)

(b)(5),(b)(6)

(b)(5)         alludes to a finding (b)(5)   that protection to then LTC Iacovetta was rendered by COL West. This was a recurring theme conveyed to complainants in multiple interviews as something that Mr. Iacovetta claimed. Astonishingly Mr. West conveyed in his testimony (Ex K-2 pp. 13-14) , "And I will tell you again, I cover for the guy who does good for me. And it's his professionalism and he's done well for me with his work" (Tab D, 19 Oct, pp. 13-14)

This investigator also notes that all testimonies, including those not referenced in findings in this case  was requested and submitted as evidence in a lawsuit pending between Dr. Etherage and Mr. West. The pre-decisional ROI was also submitted.  Prior to submittal, this investigator consulted with MEDCOM SJA POC and was told that these documents had to be turned over.

Former active duty members interviewed but not included in this report are as follows:

11

DA 2823  Sworn Statement of (b)(6)

DA 2823.  Sworn Statement of (b)(6)

DA 2823.  Sworn Statement of (b)(6)

DA 2823.  Sworn Statement of (b)(6)

DA 2823.  Sworn Statement of (b)(6)

DA 2823.  Sworn Statement of (b)(6)

Interview (b)(6)  no sworn statement submitted, information gathering

Interview (b)(6)  information gathering, no statement submitted.

(b)(6)  information gathering, no statement submitted.

MCWR-SRP                                              15 AUG 2011

MEMORANDUM FOR:  COL Dennis Le Master, Chief of Staff, Western Regional
Medical Command, Box 339500, Mail Stop 109, Joint Base Lewis-McChord,
Washington  98433-9500

SUBJECT:  Informal inquiry into allegations of continued sexual harassment and obstruction of
justice during an ongoing 15-6 investigation

1. References.

    a.  RCM 303

    b.  AR 600-20

2. This report is provided in response to my assignment as Investigating Officer IAW RCM
303 and AR 600-20, to conduct an informal inquiry into whether members of Department of
Psychology at Madigan Army Medical Center have been sexually harassed and whether any
member of the clinic has attempted to interfere with any inquiries into complaints of sexual
harassment by psychological health personnel. I have prepared this report with true
recognition of the importance and sensitivity of these issues.

3. Background. I make the following findings of fact based upon a preponderance of
the evidence I reviewed.

    a.  This informal inquiry is involved with the section in Psychology Department which
specializes in Research and Program Development regarding Behavioral Health
screening issues and evaluation. The Psychology Department has 91 staff employees
and 20 Graduate Medical Interns and Residents. The Psychology Department is
separate from the Departments of Psychiatry, Social Work and Drug and Alcohol
Counseling, and TBI Psychologists. The Psychology Department has various sections
which are located at MAMC proper and Old MAMC. (See org chart).

    b.  The research team is divided into two subsections, the Program Assessment
Research Section (PARS) and the Automated Behavioral Health Center (ABHC). The
two teams are co-located in a small wing of Old MAMC, and just over a year ago they
split into the two teams. Reportedly the split was generated by a growing sense of
hostility between Dr Etherage and Mr. Johnny L West at MEDCOM who were both
working on the ABHC project. This dispute has reportedly resulted in a law suit by Dr
Etherage, one of the main developers of the ABHC program, against Mr. Johnny West
for defamation of character. Mr. Johnny West is the supervisor of Mr. Glenn Iacovetta,
the MAMC Program Manager for ABHC. The division resulted in Mr. Iacovetta, Retired
LTC Army Helicopter Pilot, becoming the supervisor of two employees (Dr Karstin
Slade, PhD and Ms Naomi Croce) and 4 vacant clinical psychologist positions. And Dr.

$\mathcal{C}$

MCWR-SRP
SUBJECT:  Informal inquiry into allegations of continued sexual harassment during an ongoing 15-6 investigation

Etherage, clinical Psychologist, became the Supervisor of three employees (three research/clinical psychologists -Dr Cory Harmon, Dr. Michael Jones, Dr. John Okiishi, and one vacant position).

c.  In fall 2010, an AR 15-6 investigation was initiated by MAMC to look into sexual harassment allegations against Mr. Iacovetta initiated by Dr Cory Harmon.  Mr. Iacovetta had been the supervisor of Dr Harmon prior to the split.  The investigation took from Oct 2010 to July 2011 for resolution.  The AR 15-6 investigation commenced in early October and closed at the end of November 2010.  Review and the writing up of the investigation lasted until June 2011. (b)(6)

(b)(6)

d.  Mr. Iacovetta returned to work in July 2011, to his previous position.  He was, however moved from the position belonging to MAMC and placed under MEDCOM. The ABHC team is about to deploy the ABHC program to the Army enterprise.  Since then the female complainants have gone to JAG, EEO, the Union Representative, talked to the Departmental Leadership, the MEDCOM ABHC Leadership, and MAMC Leadership. Dr Slade has retained legal representation, but states that the representation it is not concerning this investigation.

4.  New allegations.  Three female employees who were co-located with Mr. Glenn Iacovetta throughout the AR 15-6 investigation have alleged that Mr. Iacovetta continued to harass them, threatened them, interfered with the investigation, and engaged in other sexually related misconduct.   Their allegations can be summarized as follows:

a.  Workplace sexual harassment continued after the 15-6 report was submitted in Dec 2010.

b.  Threatening and defaming comments about Dr Cory Harmon during the investigation lead to under reporting by Dr Slade.

c.  Several errors are alleged with respect to the investigation and its review, to include:

(1) Interference by Mr. Iacovetta by asking for Dr Slade's sworn statements and making threatening comments about Dr Harmon during the investigation and contacting Dr Slade when he was asked to have no contact.

MCWR-SRP
SUBJECT:  Informal inquiry into allegations of continued sexual harassment during an ongoing
15-6 investigation

(2) Open discussion of the 15-6 investigation within the Department of
Psychology (co-workers in leadership sympathizing with Mr. Iacovetta and leaks to Mr.
Iacovetta that there were negative statements by Dr Slade).

(3) Interference by Mr. West who had made a Quid Pro Quo comment on a
TELCON just prior to the appeal process (heard by DR Slade and ten others on the
conversation).

(4) Error in the Investigating Officer's advice. The IO allegedly told Ms Croce she
had no right to have a Union Representative or Supervisor present during the interview.
He also advised the three complainants that their statements were entirely confidential,
which led them to believe, notwithstanding the Privacy Act declarations, that their
statements would never be released to anyone involved in the case.

(5) Errors in the review process. Specifically, there was a concern that MAMC
personnel appeared to not have thoroughly reviewed the evidence. Dr Harmon asserts
she met with Dr Yoest during the review. During their conversation, she felt he was
suggesting that she had encouraged Mr. Iacovetta's advances toward her. She also
believes that the reviewing authority had not read all the evidence. She says that Dr
Yoest told her that others did not witness Mr. Iacovetta's tickling and her telling him "no."
In reality, she was told by other witnesses, after the investigation that they had
witnessed this and they wrote this in their statements that Dr Harmon had told Mr
Iacovetta to stop this behavior, and that he had not.

(6) After the completion of the investigation and the resulting personnel action,
the witnesses were concerned that MEDCOM and MAMC did not take appropriate
corrective action to create a safe environment in the work place. Allowing Mr. Iacovetta
to return to the same position as supervisor of Dr Slade and Ms. Croce forced these two
employees to have to look for a new job, and subjected Dr Harmon to his presence after
having made threatening remarks about Dr Harmon.

5.  I asked the questions listed below of each of the witnesses.  I found the witnesses to
be credible and conclude that their allegations are supported by a preponderance of the
evidence.  I list specific findings and recommendations in paragraph 6.

Question concerning the investigation
1. Describe any sexually offensive or discriminatory behavior engaged in by
ABHC/PARS staff or providers. See statements by all three Women. Summary is
provided here:

MCWR-SRP
SUBJECT:  Informal inquiry into allegations of continued sexual harassment during an ongoing
15-6 investigation

- Homophobic comments and exclusion to outside office events among the PARS team and sexist and bigoted remarks by Dr Michael Jones (in 15-6, Dr Slade's first and second statement).

- Dr Slade felt singled out by Dr Etherage as needing a license at the 11th hour when she had not been seeing patients and was never told that she must have a license at her one year mark. That was not in the job description, or in a counseling statement, and civilian personnel did not say that it was required. This occurred before the split in the team; however, the split was felt to be needed by the time it occurred. Also felt a general hostility and a sense of exclusion once people in the PARS team knew she was gay. (In Dr Slade's )

- Racist remarks concerning Mormons by Glenn Iacovetta witness by Drs Slade and Harmon.  Both employees are Mormon. Inappropriate comment by Dr Harmon about "Nigga" (in AR 15-6 by Dr. Slade)

- Sexual harassment comments as follows (that were before and after the AR 15-6 investigation):

- Mr. Iacovetta inquiring about Dr. Slade's bra size. (New, not in 15-6)

- Commenting on work apparel e.g. telling Dr Harmon that he liked the shirt she was wearing because it emphasized her form nicely. (In 15-6)

- Telling subordinate, Dr Slade, that she should wear skirts to work. (In 15-6 but mentioned again after 15-6 was closed to new intake of information)

- Telling subordinates, both Dr Harmon and Dr Slade separately that he would like to take her shopping because he would like to dress her. (In 15-6)

- Describing to Dr Slade, his subordinate, of his approximate 19 sexual relationships and indiscretions.(one described in 15-6 with prostitutes overseas – all others new, not in 15-6)

- Mr Iacovetta making sounds as if he was masturbating in his office either by phone sex or otherwise with his door open in his office, and when this was described as being overheard, by Dr Slade, he turned red and did not deny that occurred, but rather said that it was before work hours. (In 15-6 by Dr Harmon; the non-denial to Dr. Slade is new, and not in 15-6)

4

MCWR-SRP
SUBJECT:  Informal inquiry into allegations of continued sexual harassment during an ongoing
15-6 investigation

- Hiring based on physical appearance e.g. comments about employee being easy, having kids, and looking like a partier as a reason not to select her for a position.(new, not in 15-6)

- Physical contact in the form of tickling, rib poking, massaging, and touching on a daily basis despite Dr Harmon and Ms Croce indicating disapproval. This type of physical contact was experienced and witnessed by Dr Slade, Dr Harmon and Ms. Croce. This same behavior occurred to others, including administrative assistants in the Psychology Department at MAMC main hospital, witnessed by Ms Croce. (in 15-6, but in more detail and described as witness by all three witness of this preliminary investigation, when this had only been described by Dr Harmon, and by Dr Slade in second statement, new information from Ms Croce)

- Threatening and defaming the employee, Dr Harmon, who initiated sexual harassment allegations against Mr. Iacovetta. Witnessed by Dr Slade and leading to under reporting of his behavior by Dr Slade. (new, not in 15-6)

- Excluding employee, Ms. Croce, on the ABHC team due to "association" with the PARS team/Department of Psychology due to believing she was not to be trusted as witnessed by Dr Slade. (new, not in 15-6)

- Mr. Iacovetta's daily use of offensive profanity in the workplace.  Use it more when he seemed upset.

- Mr Iacovetta having what seemed like a domestic dispute with verbally forceful language and a violent use of profanity to a person on the phone causing Ms Croce to feel nervous, uncomfortable and afraid. (new, not in the 15-6)

- Witnessed times that Mr. Iacovetta would sneak up and poke subordinate women employees to scare them as a joke (Witnessed by Ms Croce). (new, not in 15-6)

- Overheard use of words about other women as being "hot" and "sexy". Emphasizing "Hot and sexy".

- Dr Harmon was told by Mr. Iacovetta that she had been called a "Bitch" by Mr. West from MEDCOM (the section that funded her position) at a meeting where she just sat and had lunch. The explanation by Mr. Iacovetta was because he [Mr West] knew he could not have his way with her.  Mr Iacovetta also told her that Mr. West asked why he [Mr Iacovetta] had not tried to have a sexual encounter with her. (In 15-6)

MCWR-SRP
SUBJECT: Informal inquiry into allegations of continued sexual harassment during an ongoing
15-6 investigation

- After a second visit from Mr. West, Mr. Iacovetta said that Mr. West said that Dr Harmon looked good, but her small breast and butt are too small. (In 15-6)

- Mr. Iacovetta repeatedly looked Dr Harmon up and down and would comment about wanting to take Dr Harmon shopping. (in 15-6)

- Reference about "tits" by Mr. Iacovetta to Dr Harmon. This was about two women who had been training with Mr. Iacovetta. (in 15-6)

- On one occasion, Dr Harmon asked Mr. Iacovetta a question and he smiled and he reached his hands out toward her and squeezed his hands in the direction of her breasts and said, "I am feeling frisky" (In 15-6)

   *2. Did any of this behavior occur prior to the AR 15-6 investigation into alleged sexual harassment?* Yes. See sworn statements. Each witness reported incidents. A summary list is provided here.

- Homophobic remarks by Dr Jones (in 15-6)

- Mr Iacovetta described numerous sexual encounters to Dr Slade multiple times (new, not in 15-6)

- Daily physical contact in the form of massaging, tickling, rib poking, and this same behavior occurred to others, including administrative assistants in the Psychology Department at MAMC main hospital, witnessed by Ms Croce. (in 15-6, but in more detail and described as witness by all three witness of this preliminary investigation, when this had only been described by Dr Harmon, and by Dr Slade in some in second statement of 15-6, new information from Ms Croce)

- Comments by Mr Iacovetta on work apparel and suggestions of what to wear to work e.g. asking Dr Slade to wear skirts and telling Dr Harmon that he liked the shirt she was wearing because it emphasized her form nicely. (In 15-6 by Dr Harmon, but such comments made to Dr Slade before and after AR 15-6 investigation)

- Mr Iacovetta told subordinates, Dr Harmon and Dr Slade separately, that he would like to take her shopping because he would like to dress her. (In 15-6)

MCWR-SRP
SUBJECT:  Informal inquiry into allegations of continued sexual harassment during an ongoing
15-6 investigation

- Mr Iacovetta described to Dr Slade, his subordinate, his multiple sexual relationships and indiscretions (one described in second statement, new, not in 15-6)

- Mr Iacovetta suggested he made hiring decisions based on physical appearance e.g. comments about employee being easy, having kids, and looking like a partier as a reason not to select her for a position. Another candidate was assessed by Mr. Iacovetta, Ms. Croce, as being easy to look at as a reason to hire her. (New, not in 15-6).

- Mr Iacovetta would sneak up on employees in order to scare them witnessed by Ms Croce (new, not in 15-6)

- Mr Iacovetta would refer to some women as being "hot" and "sexy;" such comments overheard by Ms Croce (new, not in 15-6)
- Mr Iacovetta asked another person, Dr Kelly Bickel (from Hawaii), that recently started working with them if she and he could have an intimate relationship. (New, not in 15-6)

3. *If any of the behavior reported occurred prior to the AR 15-6 investigation, did you report it?*

a. Dr Harmon:  Reported all of Mr Iacovetta's offensive behavior in her first statements in the 15-6.

b. Dr. Slade:  Some of the behavior it was reported, but much was left out. See statements.

(1) A summary list of what was reported.

- Homophobic comments

- Racist remarks

- Reported one but not all of Mr. Iacovetta's descriptions of his sexual indiscretions

- Physical contact, in spite of being asked not to report

(2) Did not report the following in initial statement, although it did occur prior to the investigation:

7

MCWR-SRP
SUBJECT:  Informal inquiry into allegations of continued sexual harassment during an ongoing
15-6 investigation

- She did not report that he encouraged her to wear skirts to work, which occurred after the 15-6 was closed

- She did not report Mr Iacovetta's describing his 19 affairs and current sexual indiscretions, which occurred both before and after the investigation (in her statement in the 15-6, she described only one of the many stories which was about engaging in illegal sexual activities while overseas); sexual activity that was "more than hiring a prostitute"

- Mr Iacovetta's hiring based on physical appearance. (New, not in the 15-6)

- She did not report that Mr. Iacovetta had asked her to see her first statement prior to making it.  When she told him she submitted a second statement he asked her for that (new, not in the 15-6)

    c.  Ms. Croce:  She reported some, but not all of the alleged misbehavior by Mr Iacovetta in her statement for the 15-6. She states that she used general terms and not much detail.

- She did not describe Mr Iacovetta sneaking up on employees and him sneaking up on her, and that that occurred even prior to her beginning to work with the ABHC and PARS teams, while she was in the main Psychology Department.  But she wanted a promotion and did not want to make waves. (New, not in 15-6)

- She did not report the fact that she heard him being verbally violent and excessive use of profanity on the phone at the workplace (new, not in 15-6)

- She did not report him describing Governor Sarah Palin and others as being "hot and sexy".

4.  *If the alleged behavior occurred prior to the AR 15-6 investigation, and you did not report it previously, why not?*

    a.  Dr Harmon: N/A

    b.  Dr. Slade:

- Omitted some information from her first statement for the 15-6 because she had been misinformed by Mr. Iacovetta about the purpose and nature of the investigation and claims.

MCWR-SRP
SUBJECT: Informal inquiry into allegations of continued sexual harassment during an ongoing
15-6 investigation

- More importantly, Dr Slade was reportedly asked by Mr. Iacovetta for her
  statement before she wrote it.  She agreed initially because she thought it was to
  attest to him being a nice guy and was generally not *irritable and grumpy* as he
  reportedly said was the purpose of the investigation.

- Furthermore, due to the division of the this research psychology section which
  had occurred several months prior to the 15-6, into two subsections i.e. the
  ABHC and PARS, and the pending suit for defamation of character by Dr
  Etherage against Johnny West, Mr. Iacovetta's higher headquarters in
  MEDCOM, there were two distinct teams that were at odds with each other. The
  PARS team with Dr Cory Harmon (Dr Etherage alliance) who initial brought the
  sexual harassment charges to the MAMC Chain of Command's attention and Mr.
  Iacovetta (who often reported his friendship with Johnny West as dating back to
  for years in the military) on the ABHC team. Dr Slade felt more belongingness
  with the ABHC team, and liked the work she was doing. Her statement was
  initially more focused on the hostile work place, rather than on Mr. Iacovetta's
  behaviors.

- After LTC Dickens, the 15-6 Investigating Officer, asked many questions of Dr
  Slade about possible sexual harassment charges, she began to understand that
  the complaint was other than what Mr. Iacovetta had described.  Knowing this
  was about sexually inappropriate behavior, she decided to write a second
  statement but decided to make it an "abridged version" with only information that
  she thought had been witness, so that the validity of the information would not be
  questioned and she has seen how hostile and angry he was toward Dr Harmon,
  so she feared his wrath.

- Furthermore she says that she feared reprisal and the loss of her job, due to Mr.
  Iacovetta's alliance with Dr Johnny West.  She well knew from Mr. Iacovetta that
  Johnny "owed him his life" and that they covered for each other. She comments
  that the quid pro quo aspect of their relationship was intimating. So if there was
  an adverse action toward Mr. Iacovetta, she feared Mr. West would also be angry
  and hostile towards her if she said too much.

- Also she said that initially she could not sort it all out. When she tried to report
  some information that she thought applicable (an incident involving Mr. Iacovetta
  and Dr. Bickel), LTC Dickens asked me when it occurred. I reported that it was in
  September of 2009. He reported that it was not applicable before I had even told
  him what had happened.

- In December, she was told by LTC Dickens that the investigation had already
  been submitted to Command, so when more inappropriate behavior occurred in

9

MCWR-SRP
SUBJECT: Informal inquiry into allegations of continued sexual harassment during an ongoing 15-6 investigation

subsequent months, she felt she could not report it. One example was after she wrote the second statement, he asked her for that statement. Also he continued to contact her and tell her how angry he was with Dr Harmon, and he began with the inappropriate question about bra size and sexual exploits once he thought no further data was being gathered for the investigation.

- Another reason she did not report everything previously was that this behavior has been occurring since within two weeks of her arrival at JBLM, so I was not sure what the boundaries were exactly and if she was being too sensitive about some things. She thought it was the Army Culture. She did not want to appear sensitive or uptight if this information were to be judged by others in Command, who took the same approach to employee relations as Mr. Iacovetta. She had heard from others in the department about how unfair it was that one person i.e. Dr Harmon could take down Mr. Iacovetta's whole career.

c. Ms Croce:

- She said that she was terrified of losing her job and that the last time she had lost her job; it took 1.5 years to find another.

- Ms Croce said that she generally does not have to work too closely with Mr. Iacovetta, and she thought that she had well communicated to him to not come into her personal bubble. Due to these reasons, she used general, non-accusatory wording as she did not think that she want to say too much to jeopardize her job and did not want him to know she participated in the 15-6.

- She also felt intimidated by the whole process, and she was not told that her statement was an option. She asked to have her supervisor or the union representative present, but was informed that she could not by the IO, LTC Spencer Dickens, and was her statement was totally confidential. She has since found out it is not, and it can be FOIA'd.

5. Why are you reporting this behavior now?

a. Dr Harmon: N/A

b. Dr Slade:

- She had hoped that in spite of her statement and withdrawing support for Mr. Iacovetta (b)(6)                                   she would still be able to work with Mr. Iacovetta; however, she feel that she is currently being placed in a hostile work environment due to these factors and cannot work at my full

10

MCWR-SRP
SUBJECT:  Informal inquiry into allegations of continued sexual harassment during an ongoing
15-6 investigation

potential under the current circumstances. It has gotten to the point where she
feels she no longer has anything to lose and she reports that, "I no longer have
the illusion of protection or support from anyone in my command." I realized that
when she was not notified by Mr. Iacovetta that he was being reinstated, that he
was aware of some of the things I wrote in my second statement.

- She now knows that she cannot work with him because she knows how he
  regards any negative comments after what he has said about Dr Harmon.  His
  being reinstated into the same leadership position, would just not a comfortable
  work situation.

- She feels that interference by Mr. Iacovetta and the relationship that he has with
  Mr. Johnny West made for an unfair investigation process. She thinks that Mr.
  Johnny West's statement about who does he need to talk to in the command
  suite, and the fact that he said that one of them owes him, may have interfered
  with a fair decision.

- Additionally,  the fact that the Investigating Officer seemed to advise her
  incorrectly e.g. When she tried to report some information in the first
  investigation, LTC Dickens told her it was not applicable. She says, "I now doubt
  that this is accurate and so I am providing an exhaustive list to let JAG determine
  was in applicable and what is not."

- She thought that the information that she provided would be enough for
  Command to make the right decision. She states that "I can only conclude that
  they didn't think what had been reported in the first statement was inappropriate
  enough to terminate Mr. Iacovetta and I am also concerned about the fact that
  Mr. Iacovetta's inappropriate behavior toward me did not change after the
  investigation was initiated."

c. Ms Croce:  States that she is willing to be more forthcoming, because she says it
   is all out in the open now. She says since the investigation can be FOIA'd Mr
   Iacovetta will know she participated, so it does not matter if she participates
   further.

6. Has alleged sexually offensive or discriminatory behavior occurred during or
   since the AR 15-6 report of investigation?  Please describe any alleged behavior.

a. Dr Harmon:

- States that she has been defamed and retaliated against and this has been
  confirmed from Dr Slade when the investigation had closed

11

MCWR-SRP
SUBJECT:  Informal inquiry into allegations of continued sexual harassment during an ongoing
15-6 investigation

- Dr Slade told her that she witnessed Mr. Iacovetta disparaging and "defaming"
  both Dr Harmon and Dr Etherage to numerous individuals including herself, Dr
  Jack Miller, Kendra Lebel, and others at the MAMC Informatics Department.
  These comments occurred during the investigation.

b. Dr Slade:

- States that Mr. Iacovetta's general inappropriate behavior did not change after
  the investigation was initiated. This includes the following list.

- Homophobic comments

- Racist remarks

- Sexual comments in the form of inquiring about my bra size, commenting on my
  work apparel and telling me what he thought I should wear to work, telling me
  that "Asian women will do anything. I mean anything," and describing his sexual
  indiscretions.

- Hiring based on physical appearance

- Comments about a candidate being too easy, having kids, and looking like partier
  as a reason not to select her for a position.

- Physical contact in the form of tickling, rib poking, massaging.

- Threatening and defaming the employee who initiated sexual harassment
  allegations him.

- Excluding employees who were on the ABHC team due to "association" with the
  PARS team/Department of Psychology.

- Not having her concerns about the homophobic remarks from Dr. Jones
  addressed by command, and then being asked to work with Dr. Jones on
  research projects again, if she was no longer willing to work with Mr. Iacovetta.

c. Ms Croce:  Feels that there is mistrust, and Mr Iacovetta has been keeping her
   out of the loop on issues she needs to know about since the investigation began.

MCWR-SRP
SUBJECT: Informal inquiry into allegations of continued sexual harassment during an ongoing 15-6 investigation

7. *Has any supervisor or staff member in ABHC taken or threatened to take any retaliatory action against you or any other witness based upon participation in the AR 15-6 sexual harassment investigation? Describe any such alleged retaliatory action.*

a. Dr Harmon: See comment on above question.

b. Dr Slade:

- She says that Mr. Iacovetta made vague threats about Dr. Harmon. This was after the intake of the sworn statements.

- Mr. Iacovetta disclosed that he had anger issues several times to Dr Slade. On one occasion she asked him if he owned any guns. He stated "you don't really want to know the answer to that."

- On a couple of occasions he stated he hoped he didn't run into Dr. Harmon because he is not sure what he would do to her.

- He stated that Dr. Harmon would regret initiating the 15-6. He also made these sorts of threats about Dr. Etherage and his claims against Mr. West and PARS' attempts to sabotage the ABHC program.

- Mr. Iacovetta also spoke of Mr. West's appreciation for loyalty and shared that Mr. West would terminate or get rid people in active duty who did not have this quality, according to his definition of loyalty. Mr. Iacovetta shared one story in particular about an SM who disagreed with Mr. West. Mr. West did not see it the same way as this SM. This SM decided to go up the chain of command to resolve it. Mr. West found out and told the SM that that wasn't the way he ran things and to "get out". "The SM thought Mr. West was kidding, but Mr. West was not." This story was relayed to Dr Slade during the investigation. Dr Slade said, "I took this as a veiled threat."

c. Ms Croce:

- Even before the end of the investigation, Ms. Croce found that the new Organization Chart did not include her. (See the organizational Chart)

- Ms Croce indicated that on the day that Mr Iacovetta was told he was to be terminated, her supervisor thought offered for her to work at the main hospital, as there was hearsay that Mr. Iacovetta bringing a weapon to work during his time in the military.

13

MCWR-SRP
SUBJECT:  Informal inquiry into allegations of continued sexual harassment during an ongoing
15-6 investigation

8. *Did any supervisor or staff member in ABHC ask to review or comment upon your or any witnesses' statement(s) prior to completion of the statement and submission to the investigating officer in the AR 15-6 sexual harassment investigation?  Describe any such statements or actions.*

a.  Dr Slade:  Mr. Iacovetta informed Dr Slade that a 15-6 was initiated and that someone would be interviewing her. Mr. Iacovetta asked to see a hard copy (specifically, a hard copy) of her first statement and also asked to see her second statement, before she had written them. "I wrote the first statement with this request in mind. I showed him my first statement. Although he requested it several times, I never sent him my second statement. I DO have an email with a request from him to see my second statement."

b.  Ms Croce:  Did not witness any of this tampering with the investigation.

9. *If any supervisor or staff member in ABHC asked to review or comment upon your or any witnesses' statement(s) prior to the witness completing the statement and submitting it to the investigating officer in the AR 15-6 sexual harassment investigation, describe the effect of that request. (E.g., did the statement change in tone or content as a result of the supervisor or staff member's attempt to review it).*

a.  Dr Slade:  She  only wanted to include minimal information in the statement that she showed to Mr. Iacovetta. Also she was also motivated to not disclose all of the sexual harassment behavior because she felt that Mr. Iacovetta, and Mr. West, more indirectly, had the most control over her job status at that time. I worried that they would eventually find out what I wrote, so I kept the information to only that which I believed could be verified by a witness.

b.  Ms Croce:  No one asked her for her statement.

*10. If there is anything else that you would like to add, please do so here.*

a.  Dr Harmon:

• States that she let leadership know all this was happening.

• She is very upset that Dr Yoest implied that her tone to Mr Iacovetta was anything but "No, I do not want to be touched". She asked me, why would I have filed a complaint so strong, that it would initiate an investigation when it had

MCWR-SRP
SUBJECT:  Informal inquiry into allegations of continued sexual harassment during an ongoing
15-6 investigation

potential to hurt me. He was no longer her supervisor, but she just could not take
the sexual harassment anymore.

- She says that both DR Slade and Dr Jones said that their statements indicated
  that he tickled, rib jabbed and massaged, Dr Harmon's shoulders. They
  witnessed her telling him not to do this.

b.  Dr Slade:

- "See written statement and attached emails. The emails are arranged in
  chronological order. Some emails I am including were emails that I was
  uncomfortable with, but assumed was "army culture." Others I am including as
  documentation of some of what is written in my statement."

- "I remember deleting some email correspondences between myself and Mr.
  Iacovetta. To this end, I acknowledge that the emails I am providing are not an
  exhaustive list of our communications. I probably have more emails, and will do
  my best to provide any that you may request and that I may have, upon request."

c.  Ms Croce:

- States that she was hesitant to participate in the 15-6 and she felt that she did
  not have a choice. "I was not fully informed of my rights"

- She asked for a Union Rep or her supervisor (Ms Jaime McKay), but was denied
  by LTC Dickens. She contacted Mr. Lampman the Union president and he said
  that she was advised incorrectly.

- She expressed several times that she was afraid to participate for feared of
  losing her job, but the IO said that the sworn statements were entirely
  confidential. She has since learned the statements be obtained by Mr. Iacovetta
  through a release by the Freedom of Information Act.

6.  Findings.

a.  The three complainants were credible.  Their allegations of Mr Iacovetta's
misbehavior during and after the AR 15-6 investigation (sexual harassment and
interference with an investigation) were believable, and, for the witnesses who
did not fully disclose prior misbehavior during the AR 15-6 investigation, their
statements that they were afraid, that they feared reprisal, that they wished to
hang onto their jobs, and that they were concerned that Mr West at MEDCOM

MCWR-SRP
SUBJECT: Informal inquiry into allegations of continued sexual harassment during an ongoing 15-6 investigation

was protecting Mr Iacovetta, are also believable and, under the circumstances, reasonable.

b. Mr Iacovetta engaged in sexually harassing behavior toward Dr Harmon, Dr Slade, and Ms Croce both before, during, and after the preceding AR 15-6 investigation into allegations of sexual harassment in ABHC.

c. Mr. Iacovetta impeded or interfered – or at least attempted to impede or interfere - with the AR 15-6 investigation into allegations of sexual harassment. First, he attempted to minimize the investigation by telling one of the witnesses the focus of the investigation was his "grumpiness" or words to that effect. Second, he talked to witnesses about the investigation, which had been forbidden by the IO. Third, he asked to review the statement by one witness (Dr Slade) prior to her making the statement. Fourth, he made threatening and defaming comments about another witness (Dr Harmon) to Dr Slade. This caused Dr Slade to fear reprisal, causing her to under-report his inappropriate comments and actions in the workplace. Dr Slade is now reporting not only inappropriate sexual harassment issues that occurred daily since being hired, but also sexual harassment and interference during the investigation as well as after it was largely concluded.  She reports that there was a time during the investigation where Mr Iacovetta appeared to be more circumspect about his sexually offensive behavior. But after the investigation closed, he went back to his old ways, for example, by asking her bra size, asking her to wear skirts to work, telling her more stories of other his sexual encounters. He also asked her for her second statement, which she says she decided not to give him. Additionally, she reports that when Mr. Iacovetta was reportedly told to have no contact with the staff, he continued to contact Dr Slade through e-mail, which she decided not to respond to. In addition Mr Iacovetta's girlfriend (b)(6) texted Dr Slade to say that she heard that Dr Slade had written negative things about her boyfriend, Mr. Iacovetta.

d. Open discussions (initiated by or involving Mr Iacovetta) regarding the 15-6 occurred. Such discussions made Dr Slade, whose colleagues evidently regarded as being on Mr. Iacovetta's side, uneasy.  Comments were made by persons within the Department of Psychology leadership regarding their feeling of sympathy for their colleague from these "allegations".  These were made by Dr Southwell and Dr Jack Miller.  In addition, Dr Slade reports that she overheard Mr. Iacovetta discrediting Dr Harmon in the Informatics Department.  Dr Slade knows that he must have been talking to others, since Dr Miller and Southwell had sympathy for him.  In addition, the information about Dr Slade's comments somehow leaked out to Glenn and his girlfriend, who contacted Dr Slade).

16

MCWR-SRP
SUBJECT:  Informal inquiry into allegations of continued sexual harassment during an ongoing 15-6 investigation

e.  A toxic quid pro quo atmosphere exists in the ABHC.  Specific discussions suggested that officials at ABHC and at the MEDCOM office overseeing the ABHC would take actions toward employees in return for sexual favors. Evidence indicates Mr. Iacovetta stated many times to Dr Slade that his supervisor, Mr Johnny West, "ow[ed] his life to him [Iacovetta] due to covering him for extramarital relationship that occurred while he [West] was active duty." Further, in a TELCON phone conversation with at least 10 personnel in attendance, Mr. West stated he could help Mr. Iacovetta with his appeal since someone in the MAMC Command group (witnesses specifically recalled hearing the names of COL David or COL Yoest) "owed him his life".  COL David, the Deputy Commander for Administration, is an aviator, as are Mr. West and Mr. Iacovetta.

f.  Procedural issues may have affected the AR 15-6 investigation.  For example, Ms Croce and Dr Slade appear to have been incorrectly advised of their rights to have a union representative present, and possibly ambiguous advice concerning the confidentiality of the investigation left Ms Croce, Dr Slade, and Dr Harmon with the incorrect impression that that their statements were completely confidential and not discoverable through FOIA or any other mechanism. Ms Croce states that she never thought she had a choice to participate, and that she would have had a union representative present if LTC Dickens, the IO of the 15-6, had allowed her to. She feels that participation has threatened her job, and now has revealed more information about Mr. Iacovetta's behavior.

g.  Female employees in the research section of the Psychology Department now feel vulnerable because Mr. Iacovetta has made threatening remarks about Dr Harmon and, perhaps more significantly, because evidence indicates that Mr West, who purportedly owes Mr Iacovetta his life, is, as his direct supervisor, protecting him from any adverse action.  This has resulted in the female employees fearing they have no choice but to move to another job to avoid reprisal and further sexual harassment from both Mr. Iacovetta and Mr. West at MEDCOM.

7.  Recommendations:

(b)(5)

MCWR-SRP
SUBJECT:  Informal inquiry into allegations of continued sexual harassment during an ongoing
15-6 investigation

(b)(5)

HEIDI P. TERRIO
COL, MC
Inquiry Officer

18

MCWR-SRP
SUBJECT: Informal inquiry into allegations of continued sexual harassment during an ongoing
15-6 investigation

Action

I have reviewed the report of investigation.   The report is approved.   The
recommendations are taken under advisement.

I recognize that the conclusions contained in this report are largely tentative, as none of
the potential respondents has had a chance to comment upon the new allegations.   I
remain unbiased and I have not prejudged any personnel mentioned or come to any
final, formal conclusions about the culpability of any personnel mentioned in the report.
Nevertheless, for the narrow purpose of determining whether the evidence compiled
thus far warrants proceeding with a more thorough, official investigation into the
allegations made by the three complainants, the report is approved.

DENNIS P. LEMASTER
COL, MS
Chief of Staff

# Appendix C



**DEPARTMENT OF THE ARMY**
JOINT BASE GARRISON
BOX 339500, MAIL STOP 36
JOINT BASE LEWIS-MCCHORD, WASHINGTON  98433-9500

March 7, 2012

Ms. Cory Harmon
1105 N. 4th Street, Apt 3
Tacoma, WA 98403

> Complaint of Cory S. Harmon v. John M. McHugh, Secretary of the Army
> DA Docket Number ARLEWIS11JUN03128

Dear Ms. Harmon:

This is the Department of Army's final decision in the above-captioned equal employment opportunity complaint filed on September 21, 2011. Your initial contact with an Army Equal Employment Opportunity (EEO) official was on June 28, 2011.  You were issued a Notice of Right to File a Formal Complaint on September 9, 2011.

In your formal complaint of discrimination you allege discrimination based on sex (sexual harassment), religion (Mormon) and reprisal (participating in an internal investigation per Army Regulation (AR) 15-6 which included EEO allegations)

*Reprisal for participating in EEO activity:*

a.  On June 28, 2011, you found out via e-mail from a co-worker that Mr. Glenn Iacovetta (your former supervisor) would be returning to work after his proposed termination was appealed and he received a 14-day suspension. *(reprisal)*

*Hostile Work Environment based on sexual harassment:*

b.  From May 2009 until September 2010, you alleged numerous instances of your supervisor, Mr. Iacovetta, sexually harassing you by making comments about your body and engaging in unwelcome non-sexual touching.

*Hostile Work Environment based on religion:*

c.  From May 2009 until September 2010, you alleged numerous instances of your supervisor, Mr. Iacovetta, making disparaging comments related to your religious faith.

Printed on Recycled Paper

You contacted the EEO office on June 28, 2011 after you received an e-mail from a co-worker that your supervisor, Mr. Iacovetta, would be returning to work. You stated you viewed Mr. Iacovetta's return to work as reprisal for you participating in an AR 15-6 (internal) investigation in October 2010 in which you made statements against Mr. Iacovetta, alleging he had sexually harassed you, made disparaging comments relating to your religious faith, and defamed you to your colleagues.

As a result of findings in the AR 15-6 investigation, Mr. Iacovetta was given a proposed termination from employment. He appealed the proposal and was given a 14-day suspension without pay. Upon his return to work after the suspension, Mr. Iacovetta was no longer your supervisor or in your supervisory chain of command. You stated that because of professional colleagues both you and Mr. Iacovetta share and who work in some of the same circles, you were fearful of how you would be portrayed by Mr. Iacovetta since he was re-instated. You also stated you were concerned about the impact Mr. Iacovetta might have on your career and believed him remaining on the staff invalidated the complaints against him. You did not specify an incident of reprisal for participating in the AR 15-6 investigation and raising EEO allegations. You merely state that you are *fearful* of how you would be portrayed to colleagues by Mr. Iacovetta and the impact Mr. Iacovetta *might* have on your career.

Under 29 C.F.R. 1614.107(a), an agency shall dismiss a complaint that fails to state a claim or states the same claim that is pending before or has been decided by the agency or the EEOC. The complaint may also be dismissed if the complainant is not "aggrieved" by the matter alleged. An employee is aggrieved if that individual suffered "a present harm or loss with respect to a term, condition or privilege of employment for which there is a remedy." *Diaz v. Department of the Air Force*, EEOC Request No. 05931049 (April 21, 1994). It does not appear that you were aggrieved or suffered a present harm or loss when Mr. Iacovetta returned to duty after his suspension. Your speculation about future conduct, without more, is insufficient to support a claim. Mr. Iacovetta's return to work involved no loss or harm to the terms, privileges, or conditions of your employment. Pursuant to 29 C.F.R. Section 1614.107(a)(1), I am dismissing claim (a) for failure to state a claim.

Army Regulation (AR) 690-600, Chapter 3, Section 1, 3-2, states that because the timeliness factor is one of the critical elements in complaint processing, the EEO official or counselor shall determine the purpose of the individual's initial contact, that is, to seek information concerning the EEO complaint process or to proceed with the precomplaint process, and to record the initial contact accurately. When an individual contacts an EEO official or counselor seeking information concerning the EEO complaint process and is still clearly undecided at the end of the initial contact whether to proceed with the EEO complaint process, this contact is called an "information inquiry". Information inquiries are documented by the use of the Information Inquiry Summary (DA Form 7509).

You met with an EEO counselor on September 22, 2010 to discuss allegations of sexual harassment and disparaging comments based on religion by your supervisor, Mr. Iacovetta, and to get information on the EEO process. You signed the Information Inquiry Summary, Department of the Army (DA) 7509, which states "she was provided general information

regarding EEO complaint processing, emphasizing the 45-calendar day prescribed time limitation for initiating the EEO complaint process and right to representation during the EEO process, including the pre-complaint intake interview." You stated to the EEO counselor that hospital leadership had directed an AR 15-6 (internal investigation) into your allegations of sexual and religious harassment and at that time you wanted to wait and see how things turned out with the internal investigation.

On September 22, 2010, you were briefed on the 45 calendar day time limitation to start EEO pre-complaint counseling as noted on the DA 7509. You stated to the EEO counselor that you were waiting to file a complaint until after you received the results of the AR 15-6 investigation. Also on June 30, 2009, as noted on the sign-in sheet, you attended New Employee Orientation where EEO complaint processing and timelines were briefed. You did not initiate counseling within 45 calendar days. It was not until June 28, 2011 that you contacted a counselor with the intent of proceeding with a complaint.

Pursuant to 29 C.F.R. Section 1614.107(a)(2), the Agency shall dismiss an entire complaint that fails to comply with the applicable time limits for seeking EEO counseling, filing a formal complaint, or filing a class complaint. During your initial contact with an EEO counselor on September 22, 1010, you used that contact to gather information about the process, not to pursue EEO counseling. You did not initiate the complaint process until June 28, 2011 when you became aware that Mr. Iacovetta was returning to work and you were dissatisfied with the level of disciplinary action taken against him.

Pursuant to 29 C.F.R. Section 1614.107(a)(1) and AR 690-600, Chapter 4, 4-4(3, I am dismissing claims (b) and (c) for untimely EEO counselor contact.

If you are dissatisfied with this decision, your appeal rights are as follows:

## APPEAL RIGHTS FOR NONMIXED COMPLAINTS

1. An appeal may be filed with the

> *Equal Employment Opportunity Commission (EEOC*
> *Director of Federal Operations*
> *P. O. Box 77960*
> *Washington, D.C. 20013*
> *Fax (202) 663-7022*

within 30 calendar days of the receipt of this decision. The 30 calendar day period for filing an appeal begins on the date of receipt of this decision. An appeal shall be deemed timely if it is delivered in person, transmitted by facsimile or postmarked before the expiration of the filing period or, in the absence of a legible postmark, if the appeal is received by the Commission by mail within 5 calendar days after the expiration of the filing period. The complainant will serve a copy of the Notice of Appeal/Petition, EEOC Form 573, to:

3

*Department of the Army*
*Director of EEO Compliance and Complaints*
*Review ATTN:  Director for EEOCCR (SAMR-EO-CCR)*
*1901 S. Bell Street, Suite 109E*
*Arlington, VA  22202-4508*

and furnish a copy to the agency representative:

*Ms. Judy Rivera, Labor Counselor*
*Civil Law Division*
*Office of the Staff Judge Advocate*
*P.O. Box 339500, MS 69*
*Joint Base Lewis-McChord, WA 98433-9500 Fax: (253) 477-1845*
*Email:judy.rivera1@us.army.mil*

at the same time it is filed with the Commission.  In or attached to the appeal to the Commission, you must certify the date and method by which service was made to the Director for EEOCCR and the agency representative.

2.  The complainant may file a brief or statement in support of his/her appeal with the Office of Federal Operations (OFO).  The brief or statement must be filed with the OFO within 30 calendar days from the date the appeal is filed.  The complainant will serve a copy of the brief or statement submitted in support of the appeal on the Director for EEOCCR and on the agency representative at the addresses shown above in paragraph 1 at the same time the brief or statement is filed with the Commission.  The regulation providing for appeal rights is contained in Title 29 of the Code of Federal Regulations, a part of which is reproduced below:

**Part 1614.401  Appeals to the Commission.**

(a)  A complainant may appeal an agency's final action or dismissal of a complaint.

(b)  An agency may appeal as provided in Section 1614.110(a).

(c)  A class agency or an agency may appeal an administrative judge's decision accepting or dismissing all or part of a class complaint; a class agent may appeal a final decision on a class complaint; a class member may appeal a final decision on a claim for individual relief under a class complaint; and a class member, a class agent or an agency may appeal a final decision on a petition pursuant to Section 1614.204(g)(4).

(d)  A grievant may appeal the final decision of the agency, the arbitrator or the Federal Labor Relations Authority (FLRA) on the grievance when an issue of employment discrimination was raised in a negotiated grievance procedure that permits such issues to be raised.  A grievant may not appeal under this part, however, when the matter initially raised in the negotiated grievance procedure is still ongoing in that process, is in arbitration, is before the FLRA, is appealable to the MSPB (Merit Systems Protection Board) or if 5 U.S. C. Section 7121(d) is inapplicable to the involved agency.

(e) A complainant, agent or individual class claimant may appeal to the Commission an agency's alleged noncompliance with a settlement agreement or final decision in accordance with Section 1614.504.

## Part 1614.402 Time for appeals to the Commission.

(a) Appeals described in Section 1614.401(a) and (c) must be filed within 30 calendar days of receipt of the dismissal, final action or decision. Appeals described in Part 1614.401(b) must be filed within 40 calendar days of receipt of the hearing file and decision. Where a complainant has notified the Director for EEOCCR of alleged noncompliance with a settlement agreement in accordance with Section 1614.504, the complainant may file an appeal 35 calendar days after service of the claim of noncompliance, but no later than 30 calendar days after receipt of the agency's determination.

(b) If the complainant is represented by an attorney of record, then the 30 calendar day time period provided in paragraph (a) of this Section within which to appeal shall be calculated from the receipt of the required documentation by the attorney. In all other instances, the time within which to appeal shall be calculated from the receipt of the required documentation by the complainant.

### Section 1614.403 How to appeal.

(a) The complainant, agency, agent, grievant or individual class claimant (hereinafter complainant) must file an appeal with the

> *Director, Office of Federal Operations*
> *Equal Employment Opportunity Commission*
> *P. O. Box 77960*
> *Washington, DC 20013*
>
> *or by personal delivery to:*
> *One NOMA Station*
> *131 M Street, N.E.*
> *Suite 5SW12G*
> *Washington, D.C. 20507 or facsimile (202) 663-7022.*

The appellant should use EEOC Form 573, Notice of Appeal/Petition (copy enclosed), and should indicate what is being appealed.

(b) The appellant shall furnish a copy of the appeal to the opposing party (Director for EEOCCR and the servicing agency representative) at the same time it is filed with the Commission. In or attached to the appeal to the Commission, the complaint must certify the date and method by which service was made on the opposing party (Director for EEOCCR and the servicing agency representative – addresses shown in paragraph 1 above).

5

(c) If appellant does not file an appeal within the time limits of this subpart, the appeal shall be dismissed by the Commission as untimely.

(d) Any statement or brief on behalf of a complainant in support of the appeal must be submitted to the Office of Federal Operations within 30 calendar days of filing the notice of appeal. Any statement or brief on behalf of the agency in support of its appeal must be submitted to the Office of Federal Operations within 20 calendar days of filing the notice of appeal. The Office of Federal Operations will accept statements or briefs in support of an appeal by facsimile transmittal, provided they are no more than 10 pages long.

(e) The agency must submit the complaint file to the Office of Federal Operations within 30 calendar days of initial notification that the complainant has filed an appeal or within 30 calendar days of submission of an appeal by the agency.

(f) Any statement or brief in opposition to an appeal must be submitted to the commission and served on the opposing party within 30 calendar days of receipt of the statement or brief supporting the appeal, or, if no statement or brief supporting the appeal is filed, within 60 calendar days of receipt of the appeal. The Office of Federal Operations will accept statements or briefs in opposition to an appeal by facsimile provided they are no more than 10 pages long.

**Section 1614.107 Civil action: Title VII, Age Discrimination in Employment Act and Rehabilitation Act.**

A complainant who has filed an individual complaint, an agent who has filed a class complaint or a claimant who has filed a claim for individual relief pursuant to a class complaint is authorized under Title VII, the ADEA (Age Discrimination in Employment Act) and the Rehabilitation Act to file a civil action in an appropriate United States District Court.

(a) Within 90 calendar days of receipt of the final action on an individual or class complaint if no appeal has been filed;

(b) After 180 calendar days from the date of filing an individual or class complaint if an appeal has not been filed and final action has not been taken;

(c) Within 90 calendar days of receipt of the Commission's final decision on an appeal; or

(d) After 180 calendar days from the date of filing an appeal with the Commission if there has been no final decision by the Commission.

**Section 1614.408 Civil action: Equal Pay Act.**

A complainant is authorized under Section 16(b) of the Fair Labor Standards Act (29 U.S.C. 216[b]) to file a civil action in a court of competent jurisdiction within two years or, if the violation is willful, three years of the date of the alleged violation of the Equal Pay Act regardless of whether he or she pursued any administrative complaint processing. Recovery of

6

back wages is limited to two years prior to the date of filing suit, or to three years if the violation is deemed willful; liquidated damages in an equal amount may also be awarded. The filing of a complaint or appeal under this part shall not toll the time for filing a civil action.

### Section 1614.409. Effect of filing a civil action.

Filing a civil action under Section 1614.408 or Section 1614.409 shall terminate Commission processing of the appeal. If private suit is filed subsequent to the filing of an appeal, the parties are requested to notify the Commission in writing.

3. If a civil action is filed and complainant does not have or is unable to obtain the services of a lawyer, the complainant may request the court to appoint a lawyer. In such circumstances as the court may deem just, the court may appoint a lawyer to represent the complainant and may authorize the commencement of the action without the payment of fees, costs, or security. Any such request must be made within the above referenced 90-calendar day time limit for filing suit and in such form and manner as the court may require.

4. You are further notified that if you file a civil action, you must name the appropriate Department or Agency head as the defendant and provide his or her official title. **DO NOT NAME JUST THE AGENCY OR DEPARTMENT.** Failure to name the head of the Department or Agency or to state his or her official title may result in the dismissal of the case. The appropriate agency is the Department of the Army. The head of the Department of the Army is John M. McHugh, who is the Secretary of the Army.

The DA docket number identified at the top of page 1 of this letter should be used on all correspondence.

Sincerely,

*Renay Wilson*

Renay Wilson
Acting JBLM EEO Officer

Enclosures:
EEOC Form 573
EEO Counselor Report, DA Form 7510
Information Inquiry Summary, DA Form 7509
Newcomer Orientation 30 June 2009 Sign-in Roster
Newcomer Orientation EEO Program & Diversity Management slides
Notice of Right to File a Formal Complaint, mail receipt documentation

CF:
Ms. Cory Harmon
Ms. Judy Rivera, Agency Representative